IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT JACKSON

APRIL 1997 SESSION



FILED

November 10, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | |
| Appellee, | ) | No. 02C01-9610-CC-00367 |
| | ) | |
| | ) | Lauderdale County |
| v. | ) | |
| | ) | Honorable Joe H. Walker, Judge |
| | ) | |
| ROBERT GOSS and CARL HALE, | ) | (First degree murder and aggravated |
| | ) | assault) |
| Appellants. | ) | |

<u>For Appellant Goss:</u>

Robert Wilder
Bank of Ripley Bldg.
Ripley, TN 38063
(AT TRIAL)

D. Michael Dunavant
Bank of Ripley Bldg.
Ripley, TN 38063
(AT TRIAL & ON APPEAL)

<u>For Appellant Hale:</u>

Gary F. Antrican
District Public Defender
P.O. Box 700
Somerville, TN 38068
    and
Julie K. Pillow
Assistant Public Defender
151 Industrial Road
Covington, TN 38019

<u>For the Appellee:</u>

Charles W. Burson
Attorney General of Tennessee
        and
Deborah A. Tullis
Assistant Attorney General of Tennessee
450 James Robertson Parkway
Nashville, TN 37243-0493


Elizabeth T. Rice
District Attorney General
302 Market Street
Somerville, TN 38068
        and
Mark Davidson
Assistant District Attorney General
Lauderdale County Justice Center
675 Highway 51
Ripley, TN 38063

OPINION FILED:_____


AFFIRMED

Joseph M. Tipton
Judge

**O P I N I O N**

The defendants, Robert Goss and Carl Hale, appeal as of right from their jury convictions in the Lauderdale County Circuit Court for first degree murder and aggravated assault, a Class C felony. The defendants were sentenced to life imprisonment for their convictions for first degree murder. The trial court sentenced Goss as a Range II, multiple offender to ten years in the custody of the Department of Correction for the aggravated assault conviction. It sentenced Hale as a Range III, persistent offender to fifteen years in the custody of the Department of Correction for the aggravated assault conviction. The trial court ordered the defendants to serve their respective sentences consecutive to each other and consecutive to prior sentences. On appeal, the defendants contend that the evidence is insufficient to support their convictions and that the trial court erred by admitting into evidence a photograph of the murder victim. In addition, Goss contends that the trial court erred by denying his motion to suppress a statement made by him. Hale also contends that the trial court improperly denied his motion for a preliminary hearing or, in the alternative, to dismiss the indictment. We affirm the judgments of conviction.

Correctional Corporal Henry Love testified that when the offenses occurred on August 25, 1995, he was working in the control room of Unit 5 at West Tennessee High Security Facility. He stated that Hale and Willis McDonald, the murder victim, were housed in cells in C pod located next to each other but that Goss was not housed in the pod. He said that on the day of the offenses, he saw McDonald in C pod with a towel wrapped around his body. He stated that he did not see McDonald holding anything. He said that McDonald had his hands to his side holding the towel. He said that Hale then closed McDonald's cell door and Goss ran up the stairs toward Hale and McDonald who were standing near their cells at the top of the stairs. Corporal Love testified that he looked away to answer the telephone but that when he looked back, he

2

saw one of the defendants jab McDonald with an object, causing him to grab his side. He said that another inmate climbed up the stairs but turned around when the defendants faced him. He stated that Goss then hit McDonald in the chest, and McDonald fell down the stairs.

On cross-examination, Corporal Love conceded that he could not see all areas of the pod. He testified that approximately two weeks before the offenses, he saw inmates throw food and other items where Goss was working, causing Goss to become upset.

Correctional Corporal Rudy Cobb testified that he walked McDonald from the shower on the day of the offenses. He said that he did not search McDonald. He stated that he later heard McDonald calling for help and saw the defendants stabbing McDonald repeatedly as they were at the top of the stairs. Corporal Cobb said that he called for help and that other officers arrived after the defendants and McDonald were at the bottom of the stairs. He said that he tried to walk toward the defendants but that they came toward him with knives, causing him to step back. He said that Hale then stood in front of Corporal Cobb with a knife while Goss continued to stab McDonald in the chest. He stated that the defendants finally laid the knives on the table. Corporal Cobb testified that he was scared of the defendants and feared for his life. He said that the defendants appeared calm after the stabbing.

On cross-examination, Corporal Cobb admitted that his logbook states that he was in the shower area when the offenses took place, but he explained that he must have mistakenly entered the time. He denied telling anyone that he was not scared of Hale. He testified that he did not know how Goss got into C pod. Officer Cobb said that Officer Hutcherson and Correctional Corporals Williams and Freeman were present during the incident.

3

Correctional Corporal Anthony Freeman testified that he responded to a call on the radio and saw Goss stabbing McDonald in the chest. He said that McDonald was lying naked on his back without a weapon. He testified that he did not see the incident begin and that he did not see Hale stab McDonald. He stated that Hale pulled a knife out and pointed it at the officers and said, "Nobody mess with Robert Goss while he's taking care of some business." He said that Goss never came toward them with a knife and instead kneeled in front of McDonald stabbing him. He conceded that gang activity existed in the prison, but he said that he did not know if McDonald belonged to a gang.

Correctional Corporal Major Williams testified that he responded to the call for assistance. He said that he saw Hale standing at the pod door with a knife telling the officers to stay back. He said that Hale told the officers that he had nothing against them and that Goss was "taking care of business." He stated that Goss was stabbing McDonald. He said that he told the defendants to put the knives on the table and Hale replied that he wanted Goss to be safe. He said that he told the defendants a second time to place the knives on the table, and they complied. Corporal Williams testified that McDonald died about one minute later. Corporal Williams testified that Goss never said anything to him. Corporal Williams said that he did not see the beginning of the incident, nor did he see McDonald with a weapon. He acknowledged that gang activity existed in the prison, but he stated that he did not know if McDonald was a member of a gang.

Corporal Williams testified that he was the pod officer for A pod and that Goss cleaned the pod. He said that there was garbage in the floor sometimes and that Goss would clean it up. He stated that Goss did not express any concerns to him, other than a request for a job change.

4

Correctional Clerical Officer Everett Hutcherson testified that he also worked in Unit 5 on the day of the offenses and that he went to C pod in response to the code call. Officer Hutcherson testified that he saw Goss stabbing McDonald. He said that McDonald was lying flat on his back and had no weapon. He said that he also saw Hale with a knife and that Hale's hand was bloody. He stated that Hale told the officers not to bother Goss. Officer Hutcherson testified that he went in the pod along with Officers Freeman and Williams. He said that he did not remember seeing Officer Cobb. He said that Hale came toward the officers with a knife. He testified that after Goss put his knife on the table, Hale picked it up but then laid the knife back down. He stated that he never saw Hale do anything to McDonald. He testified that he did not know whether McDonald had a knife. He said that he did not see the beginning of the incident.

Correctional Corporal Scott Wilson testified that he was about one hundred yards away from Unit 5 in the property room when he heard and responded to the call for assistance. He said that when he arrived, Goss was standing by the door with blood on his hands and the officers were going inside the pod. Corporal Wilson said that he did not advise Goss of his rights before he walked up to Goss and asked him what happened. He stated that Goss replied that he had killed McDonald, referring to him by a racial epithet. Corporal Wilson testified that he asked Goss, "Do what?" and Goss replied a second time that he had killed McDonald. He stated that he told Goss that he may not have killed him. Corporal Wilson said that Goss appeared calm and that he had blood on his hands. He testified that Goss told him that he did not want to be handcuffed because he was afraid of being attacked by the inmates. He stated that Goss was then taken to D pod and handcuffed. Corporal Wilson testified that Lieutenant Timothy Bratton then read Goss the Miranda warnings. He stated that during the interview, Goss confessed and explained that he was having trouble with

5

some inmates in A pod. He testified that Goss refused to answer questions about Hale and then asked for a lawyer.

On cross-examination, Corporal Wilson stated that he did not see what happened or how it began. He conceded that he had a prior conviction for writing bad checks. He acknowledged that gang activity existed in the prison, but he said that he did not know if McDonald belonged to a gang.

Officer Carlos Hardy testified that he was the captain of the first shift. He said that he was in the officer's dining room when he heard and responded to the call for assistance. He stated that he saw many other officers in the pod and that he saw McDonald lying on the floor. Officer Hardy testified that he ordered a lockdown of the unit and the investigation of the incident was conducted by Lieutenant Timothy Bratton. Officer Hardy said that Officer Boyd gave him two homemade knives that had blood on them. He identified the two knives for the jury.

Lieutenant Timothy Bratton testified that he investigated the stabbing. He said that although he did not see the stabbing take place, he saw McDonald lying on the floor. He described the area as being blood soaked. He said that he also talked to Goss after the incident. He stated that Goss appeared calm and had blood on his hands and shoes. He said that he read Goss his rights and that Goss told him that he had experienced problems with inmates in another pod. He testified that Goss said that these other inmates were gang members and that McDonald was "trying to take up where they left off." He said that Goss told him that he got McDonald before McDonald and the other inmates got him. He testified that Goss told him that he would do it again if necessary, and that he did not know why Hale was involved. He said that Goss did not tell him that threats had been made on his life. He said that he did not see Hale

6

until a couple of days after the incident. He said that Hale had scratches on his chest and hand.

Lieutenant Bratton identified photographs he took of McDonald, the scene, and the defendants. A photograph of the scene showed a sandal worn by inmates during showers. Lieutenant Bratton testified that a Tennessee Bureau of Investigation agent reviewed his investigation but made no further investigation. He testified that two metal homemade knives were recovered from the scene. He conceded that gang activity existed in the prison, but he said that he did not know whether McDonald was a gang member.

Dr. Wendy Gunther, a forensic pathologist, testified that she performed the autopsy of McDonald. She said that McDonald suffered injuries to the heart, a lung, and other organs, causing death by internal bleeding. Dr. Gunther testified that McDonald received a total of twenty-five stab wounds, ten of which would have been fatal by themselves. Dr. Gunther described defensive wounds found on McDonald's hands and arms. She said that McDonald was five feet ten inches tall and weighed one hundred seventy-four pounds. She stated that McDonald had a tattoo, "GD," on his chest.

Inmate Jeffrey Johnson testified that he was not in C pod on the day of the crimes. He testified that he asked Officer Cobb a couple of months after the crimes if he had been afraid of Hale. He said that Officer Cobb responded that he had not been afraid. Johnson conceded that he had been convicted of armed robbery, assault with intent to commit murder, fraud, breach of trust, and writing a bad check.

Inmate Johnny Catron testified that he was not in C pod when the crimes took place but that he saw officers running toward C pod and Officer Cobb standing

7

outside the pod door. He said that he did not know McDonald. He said that Goss had told him that he was having problems with gang members. He stated that Goss said that he had argued with them about throwing trash on the floor while he was cleaning in A pod. He said that Goss acted scared and that Goss had told him that the gang members had threatened to kill him. He testified that he saw Goss going into Hale's cell the day of the offenses. Catron admitted that he had three or four convictions for second degree burglary, two convictions for jail escapes, two convictions for armed robbery, and a conviction for introduction of contraband into a penal institution.

Inmate David Mansfield testified that he lived in C pod for five days but that he had been moved and was not present when the offenses occurred. He said that he knew McDonald and had worked with him for three or four months. Mansfield said that McDonald was a member of a gang called the Gangster Disciples, and that this gang had a reputation for being bullies. He said that he saw McDonald interacting with other gang members. He said that McDonald had similar tattoos and made hand signs similar to the other gangsters.

Mansfield testified that he had problems with McDonald. He testified that McDonald told him that "you play with fire, you wind up getting burned." Mansfield believed that he was being threatened by McDonald's statement. He said that McDonald had also threatened him in the past regarding money he owed another person. Mansfield said that a few days before the crimes took place, he heard McDonald talking about an unidentified Caucasian man who cleaned A pod to some of his friends. He testified that McDonald said that the man was not doing what he should be doing. He said that McDonald stated that they would have to do something to take care of him and to let him know who was running the place. He testified that McDonald described the man as a "punk," meaning that he was a homosexual. Mansfield said that he then saw McDonald with a knife, but he conceded that he did not tell anyone

8

about it. He said that it was common for inmates to have knives. On cross-examination, Mansfield conceded that he was serving concurrent sentences for attempted first degree murder and theft of property valued over one thousand dollars.

Inmate Doug England testified that fifteen days before the crimes, he moved into A pod and lived there on the day of the crimes. He said that Goss was the cleanup person in A pod. England said that McDonald had a reputation for being a member of the Gangster Disciples. He stated that some inmates in A pod asked Goss to pass things between cells for them while he was cleaning. He testified that when Goss refused, the inmates threw milk, urine, feces, and other items at Goss. He stated that other inmates threatened to beat or kill Goss. He said that McDonald was bigger than the defendant. He testified that threats happen often in prison and that he takes them seriously. England admitted that he was in prison serving sentences for three counts of aggravated burglary.

Hale testified that he and Goss were lovers. He said that McDonald was a gang member, and he believed that trouble with one member of the gang would be trouble with all members. He said that McDonald told him that he knew about the defendants' relationship and told him that he was having problems with Goss not passing notes for his friends. Hale testified that McDonald told him that the problem would be dealt with if it were not resolved. Hale believed McDonald's statements to be a threat to his own safety as well as to Goss' safety because McDonald stated that all whites and homosexuals needed to be killed. Hale testified that on the day of the offenses, he told Goss what McDonald had said. He said that he told Goss that they should keep their eyes on McDonald and the other inmates but that they should not to do anything unless McDonald or the other inmates did something first. Hale testified that he and Goss did not plan to kill McDonald.

9

Hale testified that McDonald jerked open Hale's cell door while Hale was in the hallway and Goss was in Hale's cell. He said that McDonald had a knife in his hand. He said that he hit McDonald with his fist and took the knife away from him. He testified that he, Goss, and McDonald wrestled for the knife and that his hand was cut during the struggle. Hale stated that McDonald then fell down the stairs. He testified that he ran down the stairs after McDonald but that he did not touch McDonald again.

Hale testified that he saw Officer Cobb, but he denied waving a knife at him and said that he did not intend to hurt Officer Cobb. He said that Officer Cobb left the pod before the other officers arrived. He said that he and Goss complied when the officers told them to put down their knives. He said that because he believed that Goss would be harmed by inmates belonging to a gang who were in the hall, he picked up both knives and held them in one hand. He stated that when an officer told him that Goss would not be harmed by a gang member, he laid both knives down. Hale testified that he heard Officer Cobb state that he was not afraid of him on that day. He said that he became involved in the incident because he did not want Goss to be hurt. He conceded that Goss was not supposed to be in C pod when the offenses occurred.

On cross-examination, Hale testified that McDonald was wearing only a towel. He said that it was not uncommon to take a knife to the shower. He said that when the offenses occurred, there were three other gang members in the pod and possibly more in the showers. He testified that threats and intimidation were common in prison. He said that he did not say anything to the officers, denying that he told the officers to leave Goss alone. Hale could not explain how McDonald had been stabbed so many times, and he stated that the stabbing could have occurred as he, Goss, and McDonald were wrestling for the knife. He conceded that it was possible that he stabbed McDonald a couple of times as they were wrestling at the top of the stairs.

10

Goss testified that he was serving a twenty-five-year sentence and that he had spent two years in maximum security for assault. He testified that he was five feet-seven inches tall and weighed one hundred fifty pounds. Goss said that he lived in D pod of Unit 5 on the day of the crimes. He stated that Hale was his friend and lover. He testified that he worked as a cleanup person in A pod of Unit 5. He stated that no one wanted to work in that pod because of the gang members. He testified that anyone who offended one member of the Gangster Disciples would be attacked by eight to twelve gang members. He said that he knew McDonald was a member of the Gangster Disciples. He stated that on earlier occasions while he was cleaning, some of the gang members in A pod asked him to pass things between cells for them. He stated that when he refused, they cursed him and threw spoiled milk, urine, and feces at him. He said that they also threatened to kill him and told him their fellow gang members would do it if they could not. He said that he was afraid because of the threats. He testified that the threats to kill him started about a week before the incident.

Goss testified that he wrote letters to the wardens of two other prisons asking to be transferred to their institutions because he wanted to get away from the gang members. He conceded that he did not mention the death threats in the letters. He identified the two letters, and they were introduced as exhibits. In the letters, Goss stated that he feared gang activity at the prison and that he wanted to be transferred to get away from the gangs. Goss testified that he told Hale, Catron, and Unit Manager Jimmy Harrison about his problems. He told Harrison that he wanted to be the cleanup person for D pod. He also testified that he tried to get other jobs in prison. He stated that his requests for a job transfer were denied.

Goss testified that he went to Hale's cell on the day of the crimes. He testified that he was there from around 8:45 a.m. until the crimes occurred. He said that he had a knife with him for protection. He testified that he was scared when Hale

11

told him that McDonald had said that if Goss did not start passing things, the problem would be resolved. He stated that Hale told him not to do anything unless absolutely necessary. He testified that Hale pointed out McDonald as the person making the threats. Goss stated that he later saw McDonald stop and talk to three other gang members before going to the shower. He said that McDonald and the other inmates whispered and looked at Hale.

Goss testified that McDonald returned and approached the cell door. He said that when McDonald saw him inside, McDonald jerked open the cell door and took out a knife that had been wrapped in a washcloth. He said that he was afraid of being killed or seriously injured if McDonald came into the cell. Goss stated that he then took the knife that he had with him and hit McDonald in the chest and pushed him out of the cell. He said that Hale then grabbed McDonald's arm and pulled McDonald around. He stated that while Hale attempted to take the knife away from McDonald, Goss repeatedly stabbed McDonald. He said that Hale was able to take the knife away from McDonald. He stated that as the three men were fighting, McDonald tried to grab the knife and the defendants. He said that McDonald hit a telephone and fell down. Goss testified that he then stabbed McDonald again, and McDonald fell down the stairs. Goss said that because he was afraid the other inmates would throw him over the railing, he ran down the stairs and continued to stab McDonald until the officers arrived. Goss testified that when the officers arrived, he asked Hale if Hale wanted him to put the knife down. He said that he put his knife down when Hale told him to put it down. He stated that Hale then picked up both knives. Goss said that neither he nor Hale pointed the knives at the officers, went toward Officer Cobb with a knife, or said anything to Officer Cobb.

Goss testified that Hale then said that he did not want Goss to go where gang members could harm him. He said that when Corporal Williams told Hale that

12

Goss would not be placed in danger, Hale put down both knives. Goss said that he was afraid the gang members would attack him, even though officers were present. He stated that Hale did not have a knife before the offenses took place. Goss said that he did not plan to kill McDonald and claimed that he stabbed in self-defense because he believed that McDonald was coming into the cell to kill him. He said that the stabbing occurred because no one would help him.

On cross-examination, Goss conceded that he was not supposed to be in C pod. He said that when he saw McDonald pull out the knife, Hale's cell door was open only three to three-and-one-half inches. He testified that he stabbed McDonald first. He said that Hale appeared as soon as he pushed McDonald out of the cell. He said that he kept stabbing McDonald because McDonald continued to come toward him. He said that he did not realize that McDonald was nude and unarmed when he ran down the stairs and continued to stab him. He denied telling Corporal Wilson that he killed McDonald. He said that he told Lieutenant Bratton that McDonald had tried to kill him but that he had gotten McDonald first.

Goss testified that he had been stabbed before in prison and that he took threats seriously. He said that if McDonald had not attempted to attack him in his cell with the knife, he would not have stabbed him. He conceded that his lawyer was the only person he told about the gang members, about McDonald attacking him first, and about McDonald coming into Hale's cell.

## I. SUFFICIENCY OF THE EVIDENCE

The defendants argue that the evidence is insufficient to support their convictions for first degree murder and aggravated assault. Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979). This means that we do not reweigh the evidence, but presume that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

### A. FIRST DEGREE MURDER

The defendants contend that there is insufficient evidence of premeditation and deliberation to support a conviction for first degree murder. They argue that the only proof of premeditation and deliberation is the testimony of Dr. Gunther concerning the multiple stab wounds, and multiple stab wounds are not sufficient to establish premeditation or deliberation. See State v. Brown, 836 S.W.2d 530, 542-43 (Tenn. 1992) (more than repeated blows must be shown to establish first degree murder). Goss also argues that the evidence shows that he acted in self-defense or, at most, second degree murder. We hold that the evidence establishes beyond a reasonable doubt the defendants' guilt for first degree murder.

In the light most favorable to the state, the evidence establishes that the defendants killed McDonald deliberately and with premeditation. The proof shows that on the day of the offenses, Hale told Goss that McDonald had made threats against him and Goss. When McDonald returned from the shower wearing only a towel, Hale shut McDonald's cell door. Goss, who did not have permission to be in the pod, then ran up the stairs. Although McDonald was unarmed, the defendants stabbed him repeatedly as they struggled, and McDonald fell down the stairs. The defendants ran down the steps after McDonald, and Goss kneeled over McDonald and repeatedly stabbed him in the chest as he lay naked on the floor. As Goss was stabbing McDonald, Hale held a knife in his hand and told the officers to leave Goss alone while

14

he was "taking care of business." Afterwards, the defendants appeared calm. Also, Goss told Officer Wilson that he killed McDonald, calling McDonald a racial name. Goss also told Lieutenant Bratton that he killed McDonald before McDonald got to him, stating that he would do it again if necessary. Although the defendants claimed that they acted in self-defense, the jury was entitled to reject the self-defense claim. We hold that there is ample evidence from which the jury could conclude beyond a reasonable doubt that the defendants killed McDonald intentionally, deliberately and with premeditation.

## B. AGGRAVATED ASSAULT

Next, the defendants assert that the evidence is insufficient to support their convictions for aggravated assault. They argue that Officer Cobb's testimony is not adequate proof to show that the defendants assaulted Officer Cobb, given the fact that his testimony was contradicted by other proof. However, we presume on appeal that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See Sheffield, 676 S.W.2d at 547; Cabbage, 571 S.W.2d at 835.

The defendants also argue that the evidence does not show that Officer Cobb suffered bodily injury or was reasonably in fear of imminent bodily injury. In the light most favorable to the state, the evidence shows that the defendants came toward Officer Cobb with knives in their hands and that Hale stood in front of Officer Cobb with the knife while Goss stabbed McDonald. Officer Cobb testified that he was scared of the defendants and that he feared for his life. The jury was entitled to accredit Officer Cobb's testimony. We hold that the evidence is sufficient to establish beyond a reasonable doubt that the defendants were guilty of aggravated assault.

## II. ADMISSION OF A PHOTOGRAPH OF THE MURDER VICTIM

15

The defendants contend that the trial court erred by admitting into evidence a photograph of the murder victim. They argue that the photograph should have been excluded because it had no probative value, and any probative value was substantially outweighed by the danger of unfair prejudice, confusion of the issues, and misleading the jury or the needless presentation of cumulative evidence. See Tenn. R. Evid. 401 and 403. The defendants assert that the photograph should not have been admitted because they did not dispute the cause of death and because the autopsy report and Dr. Gunther's testimony sufficiently explained the type of wounds, the extent of the victim's injuries and the cause of death. The state responds that the photograph of the victim was relevant to establish premeditation and to rebut the defendants' claim of self-defense. It argues that the photograph was not overly prejudicial because it was taken from a distance and was not in focus.

The leading case in Tennessee regarding the admissibility of photographs of murder victims is State v. Banks, 564 S.W.2d 947 (Tenn. 1978), in which the supreme court held that the determination of admissibility is within the discretion of the trial court after considering the relevance, probative value and potential unfair prejudicial effect of such evidence. See Tenn. R. Evid. 403. The general rule, as stated in Banks, is that "photographs of the corpse are admissible in murder prosecutions if they are relevant to the issues on trial, notwithstanding their gruesome and horrifying character." Id. at 950-51. On the other hand, "if they are not relevant to prove some part of the prosecution's case, they may not be admitted solely to inflame the jury and prejudice them against the defendant." Id. at 951.

Thus, even relevant evidence should be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Id.; see also Tenn. R. Evid. 403. In Banks, the court stated, "The more gruesome the

photographs, the more difficult it is to establish that their probative value and relevance outweigh their prejudicial effect." 564 S.W.2d at 951.

The photograph of the murder victim introduced by the state in this case is from a Polaroid instant camera and is approximately three inches by three inches in size. It shows the victim from the knees up lying naked on his back on the concrete floor. The victim's arms are lying by his side. Blood is on the victim's upper body, and a pool of blood surrounds the victim's upper body. It is not a closeup shot. The photograph has a dull quality, without vivid or clear colors. The photograph also has a yellow piece of paper taped over the victim's groin area.

The record reflects that the prosecutor sought to introduce two photographs of the victim, one taken close up and the other taken at a distance. The prosecutor conceded that the photographs could be construed to be gruesome because they showed the victim nude lying in a pool of blood. He argued that they were not seeking to introduce the photographs of the victim to inflame the jury but rather to show the crime scene and the manner in which the victim was killed. The prosecutor argued that the photographs were relevant to show premeditation in that they show the ruthlessness of the attack on the defenseless victim. The trial court sustained the defendants' objection as to the closeup photograph but overruled the objection relative to the photograph taken at a distance. The court placed the yellow piece of paper over the victim's genitalia, stating that it did not want to offend any of the jurors.

We note that our supreme court has held that the fact that repeated blows or shots were inflicted on the victim is not sufficient, by itself, to establish premeditation and deliberation for a first degree murder conviction. Brown, 836 S.W.2d at 542. The court reasoned that repeated blows can also be delivered in the heat of passion without any design or reflection, and thus, only when the multiple "blows are inflicted as a result

17

of premeditation and deliberation can they be said to prove first-degree murder." Id. Therefore, the probative value of the picture relative to premeditation and deliberation is questionable.

However, our supreme court also stated that photographs of the victim may be admitted "as evidence of the brutality of the attack and the extent of force used against the victim, from which the jury could infer malice, either express or implied." Brown, 836 S.W.2d at 551; see also State v. Smith, 868 S.W.2d 561, 576 (Tenn. 1993) (Trial court did not abuse its discretion by admitting a photograph of the victim when the trial court stated that the photograph was relevant to show "'premeditation, malice and intent because of the multiplicity of these wounds and an obvious intent of whoever was inflicting these wounds.'"). In this case, the state was required to prove that the killing was intentional. See T.C.A. § 39-13-202(a)(1). The defendants claimed that they acted in self-defense and thus, were not guilty of first degree murder. The picture of the victim demonstrates that the stabbing was a brutal one and thus is probative to the issue of the defendants' intent.

We note that the picture's probative value is somewhat diminished given the other evidence in the case. The officers testified that they found the victim nude lying on his back in a pool of blood and without a weapon. Dr. Gunther provided a detailed description of the victim's injuries. The autopsy report introduced as an exhibit also detailed the nature of the victim's injuries and the cause of death. The defendants did not contest the cause of the victim's death. Goss did not deny that he stabbed the victim, and Hale conceded that it was possible that he stabbed the victim a couple of times as they were wrestling at the top of the stairs. Because this evidence was presented, the admission of the photograph could be viewed as cumulative evidence, and the need for it on the issue of the defendants' intent was minimized.

18

In weighing the probative value of the photograph against its risk of unfair prejudice, though, we do not believe that the single photograph is particularly gruesome or graphic. In our review, we are unable to conclude that the photograph's probative value was substantially outweighed by the risk of unfair prejudice. <u>See</u> Tenn. R. Evid. 403. Therefore, the trial court properly admitted the photograph of the victim into evidence.

### III. INTRODUCTION OF STATEMENT BY GOSS

Goss contends that the trial court erred by admitting into evidence his statement to Corporal Wilson to the effect that he killed McDonald. He asserts that he was in custody for <u>Miranda</u> purposes and that his statement should have been suppressed because it was made before <u>Miranda</u> warnings were given. The state responds that the statement was properly admitted because it was made before the defendant was taken into custody for the killing.

Initially, we note that the trial court did not conduct a hearing out of the presence of the jury as to the admissibility of Goss' confession. Goss asserts that this failure did not comply with the "orthodox rule" relative to the determination of the admissibility of a confession. <u>See</u> <u>State v. Pursley</u>, 550 S.W.2d 949, 950 (Tenn. 1977) (When objection made to admissibility of confession, proper procedure is to conduct hearing outside presence of jury to determine admissibility.) However, Goss relies upon procedures that were used before the adoption of the Tennessee Rules of Criminal Procedure.

Pursuant to Rule 12(b)(3) and (e), Tenn. R. Crim. P., a motion to suppress evidence must be filed and determined before trial. The rule is applicable when a claim of a constitutional right is involved whose violation would lead to suppression of evidence. State v. Foote, 631 S.W. 2d 470, 472-73 (Tenn. Crim. App. 1982). Moreover, the failure to raise the suppression issue pretrial constitutes a waiver of such issue, absent good cause that merits relief from the waiver. Tenn. R. Crim. P. 12(f).

On the other hand, we note that the state did not object to Goss raising the issue during the trial and did not raise the issue of waiver until oral argument before this court. Needless to say, Goss was not provided an adequate forum to establish good cause, if any exists, for not raising the issue pretrial.

In any event, we note that a brief bench conference was held relative to Goss' objection, but Goss did not request that a separate hearing be conducted. Rather, he argued at the conference that the statement was inadmissible because it was given before Miranda warnings were provided. The trial court overruled Goss' objection. Given all of the circumstances, we do not fault the trial court for the summary procedure it invoked.

Finally, we believe that the circumstances of the questioning in this case did not require the warnings to be given pursuant to Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966), before Goss made his admission to Corporal Wilson. Pursuant to Miranda, custodial interrogation entails "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. In State v. Anderson, 937 S.W.2d 851 (Tenn. 1996), our supreme court held that:

> the appropriate inquiry in determining whether an individual is
> "in custody" and entitled to Miranda warnings is whether, under
> the totality of the circumstances, a reasonable person in the
> suspect's position would consider himself or herself deprived

20

> of movement to a degree associated with a formal arrest." The test is objective from the viewpoint of the suspect, and the unarticulated subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question.

Id. at 855.

Miranda must be strictly enforced, but only in those situations in which the concerns that motivated the decision are implicated. Illinois v. Perkins, 496 U.S. 294, 296, 110 S. Ct. 2394, 2397 (1990). On-the-scene questioning does not implicate Miranda concerns, and thus, Miranda warnings are not required. Miranda, 384 U.S. at 477, 86 S. Ct. at 1629. Also, Miranda warnings are not required merely based on a defendant's prisoner status. See United States v. Conley, 779 F.2d 970, 972-73 (4th Cir. 1985); Cervantes v. Walker, 589 F.2d 424, 427 (9th Cir. 1978). The United States Supreme Court stated in Perkins, 496 U.S. at 299, 110 S. Ct. at 2398, that the "bare fact of custody may not in every instance require a warning even when the suspect is aware that he is speaking to an official . . . ."

Goss argues that he was in custody and thus Miranda warnings were necessary because he was incarcerated and was not free to leave. The state responds that an inmate is not in custody for Miranda purposes unless an added restriction is placed on the inmate's freedom of movement. In support of its position, the state relies upon United States v. Cooper, 800 F.2d 412, 414-15 (4th Cir. 1986); Conley, 779 F.2d at 972-73; Cervantes, 589 F.2d at 427. Under Cooper, Conley and Cervantes, an inmate is not in custody for Miranda purposes unless there is an added imposition on the inmate's freedom of movement. Relevant to this determination is (1) the language used to summon the inmate, (2) the physical surroundings of the interrogation, (3) the extent to which he is confronted with evidence of his guilt, and (4) the additional pressure exerted to detain the inmate. We agree that this standard is best suited to determine whether Miranda warnings must precede questioning in a prison setting,

21

given the fact that a prisoner would always believe that he was not free to leave the prison.

Applying this standard, we hold that Goss was not in custody, and thus, Miranda warnings were not necessary. Corporal Wilson did not summon the defendant nor did he restrict Goss' manner of movement by the nature of his questioning. The questioning occurred as the officers entered the pod. The officers had not confronted Goss with evidence of his guilt. Also, Goss was not handcuffed and moved from the crime scene until after the questioning by Corporal Wilson. We do not believe that an additional restriction was placed on Goss' freedom of movement at the time that he made the statement to Corporal Wilson. Therefore, he was not in custody for Miranda purposes.

Moreover, the questioning in this case amounted to on-the-scene, investigatory questioning. When Corporal Wilson arrived at Unit 5, he saw Goss standing by the door with blood on his hands. He then asked Goss what happened, and Goss replied that he had killed McDonald. Under these circumstances, Miranda warnings were not required. "Responses to general on-the-scene questioning by an officer during the fact finding process as to facts surrounding the crime are admissible in evidence." State v. Johnson, 685 S.W.2d 301, 306 (Tenn. Crim. App. 1984). We note, also, that after Goss was taken to D pod and handcuffed and after receiving Miranda warnings, Goss told Lieutenant Bratton that he had killed McDonald and that he would do it again if necessary. We hold that the statement was properly admitted.

## IV. DENIAL OF PRELIMINARY HEARING

Hale contends that the trial court erred by denying his motion for a preliminary hearing or, in the alternative, to dismiss the indictments. He acknowledges that a preliminary hearing is not constitutionally required. See Moore v. State, 578

22

S.W.2d 78, 80 (Tenn. 1979). He also acknowledges that it was within the prosecutor's discretion to seek an indictment through the grand jury process. See Vaughn v. State, 557 S.W.2d 64, 64-65 (Tenn. 1977). However, Hale asserts that Rule 5, Tenn. R. Crim. P., required that a preliminary hearing be conducted. He argues that he was arrested for Rule 5 purposes when he was removed from Unit 5 and placed in a lock-down unit pending trial. The state responds that the restricted nature of Hale's confinement after the killing was part of an internal disciplinary action by the prison authorities and did not constitute an arrest for Rule 5 purposes, and thus, Hale was not entitled to a preliminary hearing to reweigh the probable cause determination made by the grand jury. We agree.

Rule 5(e), Tenn. R. Crim. P., provides:

Any defendant arrested prior to indictment or presentment for any offense, whether misdemeanor or felony, except small offenses, shall be entitled to a preliminary hearing upon the defendant's request therefor, whether the grand jury of the county be in session or not.

If the defendant is indicted during the period of time in which the preliminary hearing is being continued, or at any time before accused has been afforded a preliminary hearing on a warrant, whether at the defendant's own request or that of the prosecutor, the defendant may dismiss the indictment upon motion to the court. Provided, however, that no such Motion to Dismiss shall be granted after the expiration of thirty days from the date of the defendant's arrest.

The primary purpose of a preliminary hearing is to determine whether there is probable cause to believe that the accused committed the crime charged. State v. D'Anna, 506 S.W.2d 200, 203 (Tenn. Crim. App. 1973).

The trial court denied the motion, concluding that a preliminary hearing was not constitutionally required under the circumstances. It held that a preliminary hearing is mandated only when the defendant is arrested, not when the prosecution begins with an indictment, because a post-indictment determination of probable cause is not required. The trial court's order stated that the defendants were not entitled to a

23

preliminary hearing under Rule 5, Tenn. R. Crim. P., because the defendants were in prison, already in custody and not arrested upon these charges. The order further stated that the state had the right to omit the arrest procedure and take the case directly to the grand jury.

We agree that Hale is not entitled to a post-indictment determination of probable cause, a determination already made by the grand jury. It was within the prosecutor's discretion to begin the prosecution by seeking and obtaining an indictment. Therefore, the trial court properly denied Hale's request for a preliminary hearing or, in the alternative, to dismiss the indictment.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
Joseph M. Tipton, Judge


CONCUR:


_____
David G. Hayes, Judge


_____
William M. Barker, Special Judge

24