# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs March 12, 2002

## STATE OF TENNESSEE v. WILLIAM GARRETT

**Direct Appeal from the Criminal Court for Shelby County**
**No. 00-00032     Chris Craft, Judge**

---

### No. W2001-00963-CCA-R3-CD - Filed March 27, 2002

---

The appellant was convicted by a jury in the Shelby County Criminal Court of aggravated assault. The trial court imposed a sentence of thirteen years incarceration in the Tennessee Department of Correction.  On appeal, the appellant contends that the evidence is not sufficient to support his conviction.  After review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and ALAN E. GLENN, J., joined.

A.C. Wharton, Jr., Tony N. Brayton, and Gregg Carman, Memphis, Tennessee, for the appellant, William Garrett.

Paul G. Summers, Attorney General and Reporter; Gill Robert Geldreich, Assistant Attorney General; William L. Gibbons, District Attorney General; and Amy Weirich, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### I.  Factual Background

At the time of the offense, the victim, Carliss Parks, lived with his wife, Fenicia, and his three children in an apartment at 3536 Sportsway Court in Memphis.  The appellant is Fenicia Parks' uncle and lived with the Parkses for three or four months until approximately the end of May 1999.  However, because the appellant partied all night, slept all day, and refused to work, Fenicia demanded that he move out of the apartment. The appellant left, but he did not take his clothing and personal items.

Parks testified at trial that, one morning shortly after the appellant's departure, he found the appellant asleep in his car outside Parks' apartment.  Because of the hot weather, Parks

allowed the appellant to go into the apartment to sleep. However, Parks told the appellant that he would have to leave before Fenicia came home from work. Before the appellant left, he asked Parks for money to buy gas. Parks gave him a twenty-dollar-bill and told him to bring back ten dollars. The appellant took the money and did not return until the morning of the offense.

A few weeks later, on June 23, 1999, the appellant knocked on Parks' door and asked to come inside. Parks told the appellant that he could not come in and reminded the appellant that he had not returned with change from the twenty-dollar-bill Parks had previously given him. The appellant left but returned a few minutes later and again knocked on the apartment door. Parks opened the door and saw that the appellant had some money "balled up" in his hand. The appellant told Parks, "Get your money." Parks told the appellant to keep the money but demanded that he leave.

Noticing that his daughter's toy was laying in the yard, Parks stepped outside to pick it up. As he bent down to retrieve the toy, he saw the appellant standing beside him. When he turned around, the appellant pointed a gun at Parks' face and stated, "Bitch, you know what time it is." Parks explained at trial that the phrase means, "He's fixing to hurt me, it's a robbery."

Parks reached into his pocket to get his money, intending to give it to the appellant. When he looked up, he saw the appellant trying to cock the gun. Frightened, Parks ran toward the apartment just as the appellant began firing the gun. A bullet struck Parks' elbow. Parks ran inside the apartment and called 911. He then went outside and saw the appellant running away. Parks ran after the appellant and noticed the appellant's car parked on the street. Parks stopped chasing the appellant because he did not know if anyone else was inside the appellant's car.

Parks testified at trial that during the altercation, he saw a woman standing in an upstairs breezeway of the apartments. He did not know the woman, but, in July or September 2000, he encountered her at a local Wal-Mart. Recognizing her, he approached and ask if she remembered seeing him at his apartment complex on June 23, 1999. The woman, Alicia Bradley, admitted that she was present and witnessed the shooting. Although reluctant to become involved, she agreed to testify at trial if subpoenaed.

Parks further testified that, as a result of the injury to his elbow, he was hospitalized and underwent three surgeries. He continues to have pain and attends therapy every other day. He lost his job and is disabled as a result of the injury.

Alicia Bradley testified at trial that she met Parks approximately three months before trial. She recalled that, on June 23, 1999, she went to Willow Creek Apartments to look for her child's father. As she walked into an "alley-way" at the apartment complex, she saw a "tall man" pointing a gun toward the face of a "short man." She identified the appellant as the tall man and Parks as the short man.

Bradley also recalled that the appellant and Parks were standing in a yard outside one of the apartments. Prior to the shooting, she saw Parks reach into his pocket and pull out either a piece of paper or money. The only gun she saw was in the appellant's hand. As Parks began running away, the appellant shot at him. She "took off running" because she did not want to be seen. As she ran, she heard two or three more shots.

Bradley confirmed that, in September 2000, she was at a Wal-Mart when she noticed a "little man" following her. She identified Parks as the "little man." Parks approached her and asked for her help. She reluctantly agreed to help but told him that she would testify at trial only if subpoenaed. Bradley testified that she had never seen Parks or the appellant prior to June 23, 1999.

Sergeant Angela Smith of the Memphis Police Department testified that, at the time of this offense, she was assigned to the General Assignment Bureau of the department. Her duties included the investigation of aggravated assaults, minor assaults, and shoplifting. On July 23, 1999, she telephoned Parks to schedule an appointment for him to come to her office. She explained that Parks had originally spoken with her on June 23, but he had been unable to meet with her earlier because he was hospitalized. After meeting with Parks in her office, she issued an arrest warrant for the appellant.

Officer Michael Blakely of the Memphis Police Department testified that, on June 23, 1999, at approximately 9:30 a.m., he responded to a call from Parks' apartment. When he arrived at the scene, Parks had been transported to a hospital. Officer Blakely secured and preserved the crime scene, and, while doing so, he found three casings outside Parks' apartment. No casings were found inside the apartment. Based on his training in the shooting of weapons, Officer Blakely testified that, when a semi-automatic weapon is shot, the casing does not fall where the shooting occurred but ejects to the right and can travel two to three feet.

The appellant testified at trial in his own behalf. According to the appellant, Parks is married to his niece and is also his drug dealer. The appellant recounted that, prior to June 23, 1999, he lived with Parks and Fenicia for approximately fifteen days but was asked to leave. On the day he moved, Parks gave him crack cocaine. Subsequently, on June 23, he returned to Parks' apartment around noon to get his clothes and personal belongings. He knocked on Parks' door, and Parks allowed him to come inside. When he walked in, Parks asked him to pay for the crack cocaine. He told Parks that he had no money. Parks became angry, pulled a gun, and pointed it at the appellant's face. They struggled, and, during the struggle, the gun fell to the floor and discharged. The appellant ran out of the apartment. As he was running down the sidewalk, the appellant heard gunshots. The appellant admitted that he did not report the incident to the police.

Betty Hagan testified on behalf of the appellant. She testified that, around June 23, 1999, she drove the appellant to some apartments "off Knight Arnold and Winchester." Hagan was unsure of the exact date and did not know the name of the apartments. When they got to the apartments, the appellant told her that he was going to get his clothes and asked her to wait for him to come back. Hagan agreed and watched the appellant walk toward the apartments. Shortly

-3-

thereafter, she saw the appellant run from the apartments and past her car. She heard several shots, but did not see the appellant with a gun. She immediately left the area.

After deliberating, the jury convicted the appellant of aggravated assault. On appeal, the appellant contends that the evidence is not sufficient to support his conviction of aggravated assault.

## II. Analysis

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that might be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). The credibility of the witnesses, the weight to be given their testimony, and the reconciliation of the conflicts in the proof are matters entrusted to the jury as the trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); Byrge v. State, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978). The appellate courts should not substitute their judgment for that of the jury on such factual issues. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000), cert. denied, 531 U.S. 1082, 121 S. Ct. 786 (2001); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). When the sufficiency of the evidence is challenged, the relevant question is whether, after reviewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000); State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). Because a verdict of guilt removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence is legally insufficient to sustain a guilty verdict. State v. Buggs, 995 S.W.2d 102, 105-106 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992).

The appellant was convicted of violating Tenn. Code Ann. § 39-13-102(a) (1997), which statute provides that a person commits aggravated assault who:
> (1) Intentionally or knowingly commits an assault as defined in § 39-13-101 and:
> . . . .
> (B) Uses or displays a deadly weapon.

Tenn. Code Ann. § 39-13-101(a)(1) (1997) provides that a person commits assault who "[i]ntentionally, knowingly or recklessly causes bodily injury to another."

The evidence, viewed in the light most favorable to the State, supports the verdict of the jury. The evidence established that the appellant came to Parks' apartment, knocked on the door, and was denied entry by Parks. When Parks stepped outside to retrieve his child's toy, the appellant pointed a gun at his face and said, "Bitch, you know what time it is." Parks explained that the phrase means, "He's fixing to hurt me, it's a robbery." Parks threw his money toward the appellant and began running toward his apartment. The appellant fired the gun, striking Parks' elbow. See State v. Jones, 733 S.W.2d 517, 520 (Tenn. Crim. App. 1987). As a result of the injury, Parks was hospitalized and had three surgeries. He is disabled as a result of the injury. This was clearly a case in which the jury chose to accredit the testimony of the State's witnesses rather than the testimony

-4-

of the appellant and his witnesses. <u>See</u> <u>State v. Goss</u>, 995 S.W.2d 617, 626 (Tenn. Crim. App. 1998). We conclude that the evidence is sufficient to support the jury's finding that the appellant is guilty of aggravated assault.  This issue is without merit.

### III.  Conclusion

Accordingly, we affirm the judgment of the trial court.

                                              _____

                                              NORMA McGEE OGLE, JUDGE