IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 26, 2010 Session

## STATE OF TENNESSEE v. IVAN CHARLES GRAVES

**Direct Appeal from the Criminal Court for Knox County**
**No. 83856     Richard R. Baumgartner, Judge**

---

**No. E2009-00009-CCA-R3-CD - Filed February 8, 2011**

---

A Knox County Criminal Court jury convicted the appellant, Ivan Charles Graves, of first degree premeditated murder and felony murder committed during the perpetration of a kidnapping. Immediately after the jury's verdict, the trial court merged the convictions and sentenced the appellant to life in prison. On appeal, the appellant contends that (1) the evidence is insufficient to support the premeditated murder conviction because the State failed to show he premeditated killing the victim; (2) the evidence is insufficient to support the convictions because the testimony of one of the witnesses was irreconcilable with the physical evidence; (3) the State's use of his recorded jail conversations during its case-in-chief violated his constitutional rights; (4) the trial court committed plain error by allowing the jury to have transcripts of the recorded conversations during its deliberations; (5) the trial court erred by dismissing a potential juror for cause and failing to dismiss another juror for cause; and (6) the trial court erred by allowing a State witness to testify about the appellant's prior bad acts. Although the trial court erred with regard to the transcripts, the errors do not warrant reversal, and we affirm the appellant's convictions.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Bruce E. Poston and Richard Holcomb (at trial) and Katherine L. Harp (on appeal), Knoxville, Tennessee, for the appellant, Ivan Charles Graves.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## I. Factual Background

This case relates to the shooting death of James Kendall Porter on December 28, 2005, in Knox County. Jill Falls testified that in 2005, she had an addiction to crack cocaine; pled guilty to identity theft, misdemeanor theft, felony theft, and felony evading arrest; and was sentenced to three years on probation. When she got out of jail, she entered a drug treatment center. She got out of the center in November 2005 and did not use drugs in November or December. She said that around the first of December 2005, she met the appellant "at George's apartment." They became friends, and the appellant began paying Falls to clean his duplex. She said her feelings for the appellant began to grow but that they were not having sexual intercourse. Falls also had met the victim at George's apartment, but she did not know him very well.

Falls testified that on December 27, 2005, she saw the appellant at the Inskip Market and got into his car. He drove her to his duplex and accused her of stealing from him. She said she did not remember if the appellant said anything about the victim stealing from him. Falls told the appellant she did not take anything from him, and she spent the night with him. The next day, Falls and the appellant drove to the bank in order for the appellant to make a deposit and to a Hooters restaurant. Falls said the appellant knew the victim was staying at a motel on Clinton Highway and wanted to talk with him. Falls and the appellant returned to the appellant's duplex; picked up the appellant's brother, Robert Thomas, who lived with the appellant; and drove to the motel. The appellant and Falls got out of the car, and Falls knocked on the victim's motel room door. Falls knocked on the door again and walked away. The victim opened the door, and the appellant, who was holding a gun, forced his way inside. Falls returned to the car, a blue Toyota Camry, and sat in the front passenger seat. The appellant opened the motel room door and yelled for Thomas to bring him a jacket. Thomas took the jacket to the appellant and returned to the car. The appellant came out of the motel room with the victim, who had the jacket over his head, and walked the victim to the car. Falls said Thomas helped the appellant put the victim into the backseat because the victim "was trying not to get in the car." The appellant got into the backseat with the victim. Thomas drove the Camry toward Emory Road and turned onto the interstate.

Falls testified that she could not remember if the appellant said anything to the victim but that he hit the victim on the head with the gun, and the victim moaned. Thomas dropped off Falls at the apartment where "Bam and Granny" lived. Later, the appellant returned alone in the Camry and picked up Falls. Falls said that the car smelled like Febreze and that the appellant told her he "had to get the smell of that rotten bastard out of the car." The seats were also damp where the appellant had cleaned them. Falls asked the appellant about the

victim, and the appellant told her the victim had gotten out of the car and run when Thomas stopped the car to get gasoline. The appellant and Falls returned to the appellant's duplex. The next day, December 29, the appellant received a telephone call and left the home. Shortly thereafter, the police broke down the front door. Falls spoke with a police officer and told her what had happened the previous day. Falls also made a written statement.

After a bench conference, Falls changed her testimony and stated the following: On December 27, 2005, Falls saw the appellant at the Inskip Market and got into his car. The appellant told her she had "fucking made a mistake by calling him" and accused her of stealing money. Falls denied taking money from the appellant and got back into her vehicle, but the appellant pulled her out and put her back into the Camry. The appellant drove to his duplex and picked up his brother, Robert Thomas. Thomas drove Falls, who was sitting in the Camry's front passenger seat, and the appellant, who was sitting in the backseat, to Sunrise Road in east Knoxville. The appellant had a pistol and hit Falls on the head with it three times. When the appellant hit Falls for the third time, the gun fired. The bullet grazed Falls' head and struck the passenger side door. Falls said that her head was "pouring with blood" and that she thought she had been shot. Falls said that Thomas stopped the car, that she and the appellant got out, and that the appellant told his brother "to go sit at the spot, and he'd call when he got done." The appellant was still holding the gun and walked Falls into the woods. They sat down, and the appellant told Falls that he was sorry but that he had wounded her and could not let her go until she got better. The appellant telephoned Thomas, Thomas picked them up, and the three of them returned to the duplex. The appellant forced Falls to take a shower to wash the blood off her head, and he put a chair against his bedroom door so she could not leave. The next morning, December 28, the appellant took Falls to the bank and Hooters. Then they picked up Thomas and went to the motel on Clinton Highway.

On cross-examination, Falls testified that while the appellant kept her in the duplex against her will, there were a total of five people in the home. Falls acknowledged that in her written statement to police, she said she had consensual sexual intercourse with the appellant on the night of December 27. She explained that if she had not had sex with him willingly, "he was going to take it." She said that prior to December 27, she had never had sexual intercourse with the appellant. She said she did not try to leave the appellant's bedroom because "I had just had my brains beat out of my head that day" and was scared for her life. She said she did not remember the appellant going to sleep on the night of December 27. She acknowledged that she showed Officer Amy Lynn Peterson her head injuries and that the officer did not take her to a hospital. Falls said that at some point, she went to a hospital and was diagnosed with "a contusion or convulsion -- I'm not sure of the word." She said she received ointments for her open head wound and still had a dent on the back of her head where the appellant beat her. She acknowledged that people went to George's apartment to smoke crack cocaine and that she had smoked crack there previously.

-3-

Falls testified on cross-examination that when the appellant took her to the Hooters restaurant on December 28, he was holding a gun under her jacket and pointed at her back. She acknowledged that she did not mention that fact in her statement to police. Falls said that after Thomas and the appellant dropped her off at Bam and Granny's apartment on December 28, she did not try to leave because she had "just got [her] brains beat out of [her] head the day before." When the appellant picked her up from Bam and Granny's apartment, the Camry's front passenger seat and the backseat were wet where the appellant had cleaned blood off of them. Falls said she had bled on the front passenger seat the previous day when the appellant hit her head. She stated that she had never been to court for the alleged crimes the appellant committed against her and that she did not consider herself to be involved with the victim's death because the appellant was holding her against her will.

Robert James Thomas, the appellant's then twenty-seven-year-old half-brother, testified that he and the appellant grew up in separate foster homes. In 2004, they began living together in a small two-bedroom duplex. Two or three weeks before Christmas 2005, someone broke into the duplex, and the appellant's money was missing. On December 27, the appellant and Jill Falls picked up Thomas at the duplex. Thomas said that the appellant "was being pretty rough with her" and that Thomas drove the appellant and Falls to Sunrise Road in east Knoxville. Falls was sitting in the Camry's front passenger seat, and the appellant was sitting in the backseat. The appellant hit Falls with the gun, and the gun fired. Thomas dropped off the appellant and Falls, and the appellant walked Falls into the woods. Thomas received a telephone call from the appellant, picked up the appellant and Falls, and drove them back to the duplex.

Thomas testified that the next day, December 28, the appellant and Falls picked him up in the Camry, and Thomas drove them to a motel on Clinton Highway. The appellant and Falls got out of the car, and the appellant used Falls to get the victim to answer the motel room door. The appellant went inside the victim's motel room, and Falls returned to the car. The appellant came outside and told Thomas to bring him a jacket. Thomas took a jacket to the appellant and went inside the victim's room. The appellant was holding a gun, and the victim was bleeding. A white female also was in the room. Thomas put the jacket over the victim's head, he and the appellant walked the victim outside, and they put the victim into the Camry's backseat. Thomas then dropped off Falls at Bam and Granny's house, and he drove the appellant and the victim to east Knoxville. The appellant was asking the victim why the victim had robbed the appellant, and the appellant hit the victim a couple of times.

Thomas testified that he parked in front of an abandoned house on Sunrise Road and that the appellant got out and told the victim to get out. The victim ran to the house across the street and started knocking on the door. The appellant shot the victim in the upper back and walked back to the car. Thomas and the appellant drove along Sunrise Road. However,

-4-

the appellant decided they needed to return to the house and move the victim's body because the appellant knew the woman who lived in the home and did not want her to find the victim on her porch. Thomas drove back to the house and helped the appellant carry the victim behind the abandoned house across the street. Thomas, who was carrying the victim's upper body, got blood on his pants and shirt. He said he never saw anyone search the victim's pants pockets.

Thomas testified that after he and the appellant moved the victim's body, they drove to a Dollar Store off Rutledge Pike. The appellant bought cleaning supplies and cleaned the car's backseat. The appellant dropped off Thomas at their duplex but returned to the home that night with Falls. The next day, December 29, the police came to the duplex, and Thomas gave a statement. He gave the police consent to search the duplex and took the police to Sunrise Road to show them the victim's body. When they arrived at the abandoned house on Sunrise Road, Thomas discovered the body was not where he and the appellant had left it. Thomas did not know where the body was or who had moved it. The police took him to jail, and he gave a second statement. He acknowledged that he pled guilty to facilitation to commit first degree murder and that he received a fifteen-year sentence. He said that he had never met the victim before December 28, 2005, and that the appellant killed the victim.

On cross-examination, Thomas testified that he did not help the appellant clean the car and that blood was only on the backseat. No blood was on the front passenger seat where Falls had been sitting. Prior to this incident, Falls had been to the duplex and had spent the night in the appellant's bedroom several times. Thomas saw her clean up occasionally, but, to his knowledge, the appellant did not pay Falls to clean the duplex. Thomas said he never hit the victim. Although he had testified on direct examination that the appellant shot the victim in the back, he testified on cross-examination that the victim was facing the appellant when the appellant shot the victim five or six times. He also said the victim was standing on a porch about twenty feet away from the appellant. Thomas acknowledged that just prior to the shooting, the victim was knocking on the door of the home. He also acknowledged that the victim turned around and that the appellant shot him. He denied returning alone to Sunrise Road to move the victim's body for a second time. Thomas stated that prior to moving into the duplex with the appellant, he served in the Marines but received an "other than honorable" discharge because he failed a urinalysis.

Jay Dean Miller testified that he lived at 8525 Sunrise Road, that the appellant and Robert Thomas lived in the neighborhood as children, and that he watched the appellant and Thomas grow up with his children. The appellant's mother or grandmother used to live in a house on Sunrise Road. Miller said that although no one currently lived in the house, "the children always [came] back" to shoot guns or fireworks. On December 29, 2005, Miller

saw the appellant standing by a blue car parked at the house. The trunk was open, and Miller did not see anyone with the appellant. That night, the police found the victim's body.

Lieutenant Terry Lee from the Knox County Sheriff's Office testified that about 2:00 p.m. on December 28, 2005, he went to the Clark Motel on Clinton Highway, spoke with a female in a motel room, and photographed the room. Red spots were on the carpet and a bed covering. Lieutenant Lee swabbed the spots and sent them to the Tennessee Bureau of Investigation (TBI) for testing. On the night of December 29, Lieutenant Lee went to Sunrise Road. Several officers were already present, and Lieutenant Lee videotaped the scene. Police officers found five spent shell casings at 8508 Sunrise Road. They also found red stains on the porch steps, red stains on an overturned chair, and blood spatter on the doorway. Officers found the victim's body wrapped in carpet behind 8515 Sunrise Road, the abandoned house across the street. Officers also found bloodstains on the grass beside the abandoned house and drag marks.

On cross-examination, Lieutenant Lee testified that he did not find any bullet holes in the house at 8508 Sunrise Road and that he found the shell casings close to the porch. He acknowledged that the location of the blood spatter on the doorway was "low," which was inconsistent with someone standing when shot.

Officer Mark Webber from the Knox County Sheriff's Office testified that he assisted with the appellant's arrest on December 29. At that time, Officer Webber thought the case was only a kidnapping. Later, Robert Thomas led Officer Webber and another officer to an area in east Knoxville. Thomas told them to park in front of the house at 8515 Sunrise Road and showed them where he and the appellant had left the victim's body. Officer Webber said that the body was not there and that Thomas appeared surprised. Officers began searching the area and found the victim covered with leaves about fifty feet behind the house.

Detective Amy Lynn Peterson Delgado from the Knox County Sheriff's Office testified that she interviewed Jill Falls on December 29 in the detective's patrol car. Falls had a "mark" on her head. Detective Delgado told Falls to call the Knoxville City Police Department to follow up on the alleged crimes the appellant had committed against her. On cross-examination, Detective Delgado testified that Falls had an abrasion on the back of her head. Detective Delgado did not remember taking Falls to a hospital or seeing any blood.

Tom Finch from the Knox County Sheriff's Office testified that on December 29, he photographed two cars. He swabbed one car's interior rear passenger-side door and the back of the driver's headrest. A bottle of ammonia was on the passenger side floorboard, and he took a brown coat into evidence. Afterward, he was called to 8508 Sunrise Road and arrived at the scene about 6:45 p.m. Blood appeared to be on the bottom of the home's door, and

spent shell casings were on the sidewalk. Some change and other items were lying on the street. Finch went across the street to 8515 Sunrise Road and saw a wallet to the side of the house and blood on the grass behind the house. Drag marks led to the victim's body, which was face-down beneath a carpet, further behind the house in a heavily wooded area. The victim's pants were pulled down, and his pants pocket was turned inside out. On cross-examination, Finch testified that the distance from the top of the porch to the first shell casing was four feet, two inches. He acknowledged that the victim's pants may have been pulled down as the victim's body was dragged. He said that if he had seen a bullet hole in the car, he would have photographed it.

Investigator Ed Rose from the Knox County Sheriff's Office testified that he assisted with the search of the appellant's duplex on December 29. Officers found a journal and two notes in the appellant's bedroom. They also found ammunition of various calibers, including .22 caliber long rifle ammunition, in a cup in the bedroom.

Steve Cross, a TBI Crime Laboratory forensic scientist, testified that he analyzed the five cartridge cases found at 8508 Sunrise Road. All of them were .22 long rifle caliber ammunition. Cross could not see enough markings on the cartridge cases to conclude they were fired from the same gun. However, he analyzed six bullets recovered from the victim and was able to conclude they were all fired from the same weapon. On cross-examination, Cross testified that .22 caliber long rifle ammunition could be fired from a pistol.

Jennifer Millsaps, a forensic scientist with the TBI, testified that blood collected from the victim's motel room floor and the rear passenger door of the blue Camry came from the victim. Blood was on the back of the Camry's headrest but was too degraded to identify the donor. Swabs from bloodstains on the porch at 8508 Sunrise Road and on the grass at 8515 Sunrise Road also belonged to the victim. The victim's blood was found on a pair of Robert Thomas' shoes and socks, but tests on a pair of the appellant's tennis shoes failed to show any blood present.

Lieutenant David Henderson from the Knox County Sheriff's Office testified that he began investigating the victim's kidnapping on December 29. At that time, the police did not know the victim had been killed. Lieutenant Henderson's investigation resulted in the police finding a blue Toyota Camry that the appellant had been driving, and they set up surveillance on the car. When the appellant left his duplex and tried to leave in the Camry, officers surrounded him. They went to the appellant's home and knocked on the door. When no one answered, Lieutenant Henderson kicked open the door. An African-American male led the officers to an area in east Knox County. The victim's body was not where the man believed it was, but the victim's wallet was there. Officers brought a police dog to the scene and found the victim's body in the woods.

Buddy Burkart, the Technical Support Supervisor for the Knox County Sheriff's Office, testified that he was responsible for taking care of the office's electronics, telephones, and computers. He explained that when the police arrested a person and took the person to jail, the person received a personalized identification number (PIN) in order to make telephone calls. The Sheriff's Office maintained a list of all telephone numbers an inmate called and the date and time the inmate placed a call. Burkhart stated that each inmate had a list of ten telephone numbers he or she could call and that inmates could only call the telephone numbers on the list. The State played a recording of some of the appellant's jailhouse telephone calls for the jury.

Officer Johnny Chad Faulkner from the Knox County Sheriff's Office testified that he transported the appellant and Robert Thomas to the Knox County detention facility on December 30. He stated that his patrol car was equipped with a video camera and a microphone and that the appellant was "uneasy." Officer Faulkner said the appellant told him Thomas "had nothing to do with it, and that he was just a participant in getting rid of the body." On cross-examination, Officer Faulkner testified that Thomas was in the car with the appellant when the appellant made the statement. The State played the videotape from Officer Faulkner's patrol car for the jury.

Darinka Mileusnic-Polchan, the acting Chief Medical Examiner for Knox County, testified that she performed the victim's autopsy. The victim was a slender African-American male who appeared to be about forty years old. He was five feet, six inches tall and weighed one hundred fifty pounds. His body was partially clothed and wrapped in carpeting. The victim had extensive blunt head trauma and numerous superficial drag marks, abrasions, and linear scratches on his body. Dr. Mileusnic-Polchan found no "vital reaction" around the superficial wounds, indicating that the victim was probably dead when he was dragged. The victim had bruises and contusions on his face and multiple gunshot wounds on his body.

Dr. Mileusnic-Polchan testified that six bullets were recovered from the victim. She described each gunshot wound, starting with the uppermost wound and working her way down to the lowest wound. The uppermost wound resulted from a bullet that entered the back of the victim's left shoulder. The bullet traveled downward, which could have been consistent with a person lying or falling down. The second wound was created by a bullet that entered the victim's left upper back. The bullet traveled upward, indicating that the victim may have been standing when he was shot. The bullet fractured a rib and struck the victim's left lung, heart, and aortic arch. A third bullet entered the victim's left lower back, traveled at a slight angle, and lodged in his vertebral column. A fourth bullet also entered the victim's left lower back, traveled slightly upward, and struck his left kidney, diaphragm, and stomach. The victim could have been standing or falling when he was struck by the third

-8-

and fourth bullets. The fifth bullet entered his chest one-half way between his nipple and the axillary region. It traveled left to right and downward, consistent with the victim's falling down at the time he was shot. Finally, the sixth bullet entered the victim's chest and traveled from left to right and slightly upward, indicating the victim may have been standing when the bullet entered his body. Dr. Mileusnic-Polchan did not find gunpowder tattooing around any of the wounds, demonstrating that they were not close-range gunshots and that the muzzle of the gun was at least three feet away from the victim.

Dr. Mileusnic-Polchan testified that the victim also had one gunshot wound to his left arm and one gunshot wound to his right thumb. She explained that the victim's various gunshot wounds indicated he was "standing on the porch and then falling and then sustaining other injuries that have a different course while falling." The victim had many contusions on his eyelids and contusions on his left cheek and scalp. A tremendous amount of hemorrhaging occurred under the scalp, and the victim had extensive skull fracturing and multiple brain contusions.

On cross-examination, Dr. Mileusnic-Polchan testified that the victim's head injuries alone could have been fatal. On redirect examination, she acknowledged that a person carrying the victim's upper body would have been more likely to get blood on his or her clothes than someone carrying the victim's lower body. She said the victim's clothing was consistent with his having been dragged face-down by his pants legs.

The State and the defense agreed to the following stipulations: Teresa Partin was with the victim in his hotel room on December 28. The police showed Partin two photograph arrays, one containing the appellant's photograph and the other containing Robert Thomas' photograph. Partin identified Robert Thomas' photograph but did not identify the appellant's photograph.

The then twenty-nine-year-old appellant testified that Robert Thomas was his younger half-brother. They were raised in different foster homes but lived in the same neighborhood, and the appellant was very protective of Thomas. About one month before the shooting, the appellant met Jill Falls at George's apartment. Falls and the victim were there smoking crack cocaine. The next day, the appellant began a sexual relationship with Falls. He said that he never paid her to clean his duplex and that he also saw her with the victim. On the night of December 27, 2005, the appellant went to a nightclub with a woman named Nicole and received a telephone call from Falls. Falls wanted to come to the duplex, but the appellant told her he was going to be out all night. The appellant spent the night at Nicole's home. When he returned to the duplex the next morning, December 28, he discovered that someone had broken into the home and had taken eight hundred dollars from the nightstand by his bed and a toolbox containing tools from his bedroom. The appellant suspected Falls had

something to do with the burglary because she knew he was going to be away from the duplex all night. Later that day, Falls telephoned the appellant and asked to come over. When she arrived, the appellant confronted her. At first, Falls denied taking anything from the appellant. However, she eventually admitted to him that she and the victim were involved.

The appellant testified that he was mad and hurt. Falls offered to repay him, so they drove to Falls' bank, but Falls did not have any money in her account. Falls then directed the appellant to the motel on Clinton Highway where the victim was staying. The appellant thought the victim carried a gun, so he returned to the duplex to get his own gun and pick up his brother. Thomas drove the appellant and Falls to the motel. Falls was sitting in the front passenger seat, and the appellant was sitting in the backseat. All three of them got out of the car, and Falls knocked on the motel room door. When the victim opened the door, the appellant pushed his way inside. Thomas also entered the room. The appellant said that a white female was in the room with the victim and that the appellant told her, "We're not going to hurt you or anything like that. I just want my stuff back." The appellant grabbed the victim and hit him in the face with the pistol. The victim fell onto the bed, and the appellant gave the gun to Thomas while the appellant looked around the victim's room for his stolen property. Thomas hit the victim on the head a couple of times. The appellant did not find his money or tools, so he and Thomas took the victim outside and put him into the car. The appellant said Falls wanted to go to George's apartment, but George was not home, so Thomas dropped off Falls at Bam and Granny's house. He said that Bam and Granny were women and that Granny was "about 60 year old, white hair, frail woman." The appellant said he never told Bam and Granny to hold Falls hostage.

The appellant testified that Thomas drove him and the victim out to the country because the appellant needed to go somewhere quiet and secluded to think. The victim was moaning and would not reveal the location of the appellant's money and tools. Thomas pulled over so the appellant could urinate, and the appellant got out of the car. The victim also got out of the car, ran up the steps at the house across the street, and ran onto the porch. Thomas chased the victim. When Thomas reached the bottom of the steps, he shot the victim several times. The victim fell and slumped onto the porch. The appellant stated that he was in shock and that he and Thomas returned to the car. The appellant said they drove away but returned shortly thereafter because he did not want to leave the victim "on Ms. Anderson's porch." Thomas and the appellant carried the victim across the street and left him behind an abandoned house. Then they drove to the Dollar General Store, bought cleaning supplies, and cleaned the car's backseat. The appellant dropped off Thomas at the duplex, and the appellant picked up Falls at Bam and Granny's house. Then the appellant and Falls returned to the duplex. The appellant said he and Falls did not have sexual intercourse that night because "[t]hat was the last thing on my mind." The police arrested the appellant the next

day, and the appellant ended up in the same patrol car with Thomas. The appellant said he told Thomas to "let me handle this. Just -- just blame everything on me." He said that Thomas lied during his testimony, that Thomas shot the victim, and that he was hurt because Thomas lied "to get a good deal." He said that once the State gave Thomas a "deal," Thomas should have come forward and told the truth.

On cross-examination, the appellant testified that he had borrowed the blue Camry from someone. He said he did not remember telephoning the police on March 17, 2005, and reporting that Thomas had taken property out of the appellant's bedroom. He acknowledged that in one of the jailhouse telephone conversations played for the jury, he described a previous incident in which the victim and two other men pulled a gun on him. However, he said that he was lying and that the incident never occurred. He stated that he grew up in the house at 8512 Sunrise Road, which was near the home where the police found the victim's body. He said that he was not on Sunrise Road on December 29 and that Jay Miller was mistaken about seeing him with the blue Camry. He acknowledged that while he was in Officer Faulkner's patrol car, he said he was "not sorry for nothing" and the victim "had it coming." He said he was sorry and ashamed that Thomas panicked and shot the victim. He acknowledged that he did not call 911 after the shooting and that he did not report the victim's death to the police. However, he said he was trying to protect Thomas. The appellant also acknowledged that he thought the victim carried a gun and was dangerous. He said that he did not hit Falls on the head on December 27, that the gun did not accidentally fire, and that he only wanted to get his property back from the victim. The appellant said that he thought Thomas shot the victim with a .22 caliber automatic pistol and that he did not know what Thomas did with the gun after the shooting. He said he did not return alone to Sunrise Road and did not move the victim's body.

Carlton Porter, the victim's nephew, testified on rebuttal for the State that the victim used crack cocaine. However, he said the victim was a "family person" and loved his nieces and nephews. Porter said he had never known the victim to carry a weapon and had "[n]ever known him to be tough or try to be tough or causing any problems." On cross-examination, he acknowledged that the victim was a convicted felon.

Jill Falls testified on rebuttal that she went to the emergency room at Fort Sanders Hospital on December 30, 2005, complaining that she had been hit on the head with a pistol and had jumped out of a car. On cross-examination, she acknowledged that a CT scan was performed and that the results of the scan were normal. The jury convicted the appellant of first degree premeditated murder and first degree felony murder committed during the perpetration of a kidnapping.

## II. Analysis

A.  Sufficiency of the Evidence: Premeditation

The appellant argues that the evidence is insufficient to support his first degree premeditated murder conviction because the evidence failed to show he premeditated killing the victim.  The State contends that the evidence is sufficient.  We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e).  The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. See State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury.  See id.  Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

First degree murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1).  A premeditated killing is one "done after the exercise of reflection and judgment."  Tenn. Code Ann. § 39-13-202(d).  The element of premeditation is a question of fact for the jury.  State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003).  Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing.  Bland, 958 S.W.2d at 660.  In State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000), our supreme court delineated the following circumstances from which a jury may infer premeditation:

> Declarations by the defendant of an intent to kill, evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, infliction of multiple wounds, preparation before the killing for concealment of the crime, destruction or secretion of evidence of the murder, and calmness immediately after the killing.

The jury may also infer premeditation from the establishment of a motive for the killing and the use of multiple weapons in succession. State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004).

The appellant acknowledges that the unarmed victim was shot multiple times. However, he argues that the record is devoid of any evidence that he made declarations of an intent to kill, prepared before the killing to conceal the crime, or used multiple weapons in succession. In addition, he contends that the evidence does not show he procured a weapon for the purpose of killing the victim or that the killing was particularly cruel. Regarding motive, he argues that the evidence shows he only wanted to recover his property from the victim and that Falls' testimony about his "heavy handed" tactics do not establish revenge for the burglary. Regarding concealment of the crime, the appellant contends that nothing shows who disposed of the gun or how, that forensic evidence does not connect him to moving the victim's body, that Jay Miller's testimony about seeing him on Sunrise Road on December 29 is "entirely too speculative and weak," and that someone's cleaning the Camry's backseat is not enough evidence alone to support a finding of premeditation. Finally, regarding calmness immediately after the killing, he argues that the evidence indicates he and Thomas panicked and quickly left the scene after the shooting. He also notes that he testified at trial he was in shock.

Taken in the light most favorable to the State, the evidence is more than sufficient to show premeditation. The evidence established that the appellant thought the victim had burglarized his apartment and had taken eight hundred dollars and some tools. By the appellant's own admission, he was "mad." The appellant allegedly believed the victim was dangerous. However, instead of contacting the police, the appellant got a gun and went to the motel to confront the victim. He then used Falls to get the victim to open the door, forced his way into the victim's motel room, and beat the victim with the weapon. The appellant did not find any of his property in the victim's room. Although he claimed he only wanted the victim to return his property, he then kidnapped the unarmed victim and continued beating the victim in the car. The medical examiner's testimony established that the appellant beat the victim severely, causing skull fractures, hemorrhaging under the scalp, and brain contusions. When the victim escaped from the car and ran onto the porch at 8508 Sunrise Road, the appellant followed and shot him at least six times. Thomas testified that the appellant walked, not ran, back to the car, and that they drove away from the scene. The appellant claimed he was in shock after the shooting, yet he was thinking rationally enough to want to return to the house and move the body off the homeowner's porch so she would not find it. Thomas helped the appellant carry the victim behind the abandoned house across the street, and the appellant avoided getting the victim's blood on his clothes because he carried the victim's lower body. He and Thomas then drove to a store where the appellant bought cleaning supplies and cleaned the victim's blood off the backseat.

The testimony further established that when Thomas returned to the abandoned house with the police the next day, he was surprised the victim's body was not where he and the appellant had left it. Jay Miller remembered seeing the appellant in the area on December 29 because that was the day the police found the victim's body. Based upon the evidence, a rational jury could have determined that the appellant later returned to 8515 Sunrise Road, wrapped the victim in a carpet, and moved the body into the heavily wooded area behind the house. Evidence of procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of this killing, the infliction of multiple wounds, the destruction and secretion of evidence of the murder, and the appellant's calmness immediately after the killing support the jury's conclusion that the appellant premeditated killing the victim.

## B. Sufficiency of the Evidence: Physical Facts Rule

The appellant contends that the evidence is insufficient to support the convictions because Robert Thomas' testimony must be disregarded due to the physical facts rule. Specifically, he argues that Thomas' description of the shooting is entirely irreconcilable with the physical evidence because Thomas testified that the victim was facing the appellant the entire time of the shooting and that the appellant shot the victim from twenty feet away. However, the victim's autopsy showed four gunshots entered the victim's back, and the police found the spent shell casings at a distance much less than twenty feet. The State argues that the evidence is sufficient because the physical facts rule is not implicated under these circumstances. We agree with the State.

Our supreme court has described the physical facts rule as follows:

> the accepted proposition that in cases where the testimony of a witness is entirely irreconcilable with the physical evidence, the testimony can be disregarded. That is, where the testimony of a witness cannot possibly be true, is inherently unbelievable, or is opposed to natural laws, courts can declare the testimony incredible as a matter of law and decline to consider it. . . . [W]here undisputed physical facts are entirely inconsistent with and opposed to testimony the physical facts must control. No jury can be allowed to return a verdict based upon oral testimony which is flatly opposed to physical facts, the existence of which is incontrovertibly established. Courts have made it clear that in order for testimony to be considered incredible as a matter of law, it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under

-14-

the laws of nature. Thus, for example, if a witness was to testify that he saw the sun set in the east, the court would be free to declare such testimony incredible as a matter of law and disregard it.

State v. Allen, 259 S.W.3d 671, 679-80 (Tenn. 2008) (quotation marks, citations, and ellipses omitted). The rule applies to criminal cases. See State v. Hornsby, 858 S.W.2d 892, 895 (Tenn. 1993). However, it is available "only where the physical facts at issue are well-established and universally recognized physical laws." Allen, 259 S.W.3d at 680 (quotation marks omitted). It "may not be invoked where its application depends upon assumptions or calculations based upon estimates as to speed, distance, time, and other such uncertain matters in the movement of objects." Id. (quotation marks and brackets omitted); see also State v. Israel Dean Bolinger, No. E2008-01576-CCA-R3-CD, 2010 Tenn. Crim. App. LEXIS 485, at **6-7 (Tenn. Crim. App. at Knoxville, June 15, 2010). Nor should it be used to disregard testimony that is capable of different interpretations because the jury is responsible for weighing the evidence. See Allen, 259 S.W.3d at 681. Thus, our supreme court has instructed that the rule be used only "sparingly." Hornsby, 858 S.W.2d at 895.

Turning to the instant case, we initially note that the appellant did not ask the trial court to apply the physical facts rule and instruct the jury to disregard any part of Thomas' testimony. See Tenn. R. App. P. 36(a). In any event, we conclude there is no merit to the appellant's claim. First, because the physical facts rule does not apply to estimates of measurement or distance, it cannot be used to disregard Thomas' estimate that the appellant shot the victim from twenty feet away. Dr. Mileusnic-Polchan testified that none of the gunshot wounds were close-range wounds, meaning that the gun muzzle was at least three feet away from the victim. Her testimony was consistent with Officer Finch's testimony that the distance from the top of the porch to the first shell casing was four feet, two inches.

Regarding Thomas' testimony and the physical evidence presented in the autopsy, Thomas testified on direct examination that the victim ran onto the porch and started knocking on the door and that the appellant shot the victim in the "[u]pper back." On cross-examination, Thomas testified as follows:

Q All right. So when Kendall Porter was shot, was he facing Mr. Graves or was he -- had his back turned to him?

A Facing Mr. Graves.

Q He was facing him?

-15-

A  He had to, to get -- to get shot up here.

Q  How do you know he was shot up here?

A  I assumed he was.

Q  Pardon me?

A  I assumed he was.

Q  But how do you know?

A  I don't.

Q  But you remember telling the policemen two days after -- a day after this happened that he was facing -- Mr. Porter, the victim, was facing Mr. Graves, right?

A  Right.

Q  I mean, that's -- that's what you told them, and that's what you're telling us now, right?

A  Right.

Q  And that's the truth?

A  Right.

Q  So he's facing him as all the shots were ringing out, five, six shots, right?

A  Right.

Thomas's direct testimony comports with the autopsy results, which showed the victim was shot four times in the upper back.  On cross-examination, Thomas changed his testimony, claiming that the victim was facing the appellant the entire time of the shooting.  However, Thomas' cross-examination testimony was equivocal, stating at first that he "assumed" the victim had been facing the appellant "to get shot up here."  As noted by the trial court at the appellant's motion for new trial hearing, "the fact that a witness testifies and

-16-

that testimony ends up being inconsistent with other testimony raised at trial, even if it's -- even if it's scientific testimony, does not make it inadmissable testimony." The evaluation of the evidence rests upon "consideration of the comparative credibility of the witnesses." Id. at 896 (quotation marks and citation omitted). In this case, the jury could have concluded that Thomas' cross-examination testimony was not credible or that he simply was mistaken. The evidence is sufficient to support the convictions.

## C. Jailhouse Recordings

The appellant contends that the State's use of his recorded jailhouse telephone conversations violates his federal and state constitutional rights. The State claims that this issue has been waived because the appellant did not raise a pretrial objection to the recordings on constitutional grounds and that, in any event, the recordings were admissible because the appellant had no reasonable expectation of privacy in the telephone conversations. We conclude that the appellant is not entitled to relief.

Before trial, the defense filed a motion to exclude evidence. According to the motion, the State had given the defense a compact disc (CD) of over three hundred eighty telephone conversations that the Knox County Sheriff's Office had recorded while the appellant was in jail. The defense requested that the trial court prohibit the State from using the recordings or order the State to disclose which telephone calls it planned to introduce at trial in order for defense counsel to review them. The record reflects that sometime before trial, the State revealed to the defense that it was planning to use ten of the calls in its case-in-chief. At a pretrial hearing, the trial court noted that the appellant had no expectation of privacy in the calls, and defense counsel acknowledged that "[t]here are part[s] of the calls that I'll have to concede the state's going to get in." Nevertheless, the defense objected to the calls on the basis that they were irrelevant, prejudicial, and contained information regarding counsel's conversations with his client. At a subsequent pretrial hearing, the State, the defense, and the trial court reviewed a transcript of each call, and the trial court ruled on which portions of the calls were admissible. At trial, the State played the telephone calls for the jury. Although the CD containing the calls is not in the record before us, a transcript of the calls reveals that the appellant made multiple statements in which he admitted shooting the victim. In one call, the appellant said, "I just wanted to wound him" and "I didn't know I was a good shot like that . . . from a distance too." The appellant also stated in one of the calls that Robert Thomas "didn't have nothing to do with it."

In his motion for new trial, the appellant claimed for the first time that the recordings were "wire communications" pursuant to the Wiretapping and Electronic Surveillance Act of 1994, which encompasses Tennessee Code Annotated sections 39-13-601 to -603 and 40-6-301, et seq., and that the State's use of the recordings violated his rights under the

federal and state constitutions.  At the motion for new trial hearing, the trial court ruled that the calls were admissible because the appellant had no expectation of privacy in them and had been warned at the beginning of each call that it was being recorded.  The appellant argues on appeal that the intercepted calls violate his rights under the Fourth, Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and article I, sections 8 and 15 of the Tennessee Constitution.

The State contends that the appellant has waived this issue because he did not raise a pretrial challenge to the jail recordings on constitutional grounds.  This court has held previously that pursuant to Tenn. R. Crim. P. 12(b)(2), "'defenses and objections based on defects in the indictment,' including challenges to the constitutionality of an underlying criminal statute, must be raised prior to trial in order to avoid waiver of the issue." State v. Smith, 48 S.W.3d 159, 162 n.1 (Tenn. Crim. App. 2000) (quoting State v. Seagraves, 837 S.W.2d 615, 623 (Tenn. Crim. App. 1992)).  Although the appellant challenged the admissibility of the evidence based on issues such as relevance and prejudicial effect, at no time pretrial did he object to the recordings on the basis that they violated his constitutional rights.  The appellant replies to the State's claim by arguing that "the defense did not raise a constitutional challenge to a statute in connection with the jail recordings."  We disagree.  The appellant argues that "the jail phone call recordings are communications governed by the Act."  Therefore, he is essentially arguing that if the calls are admissible pursuant to the Act, then the Act violates his rights under the federal and state constitutions.

In any event, even if the appellant is not challenging the constitutionality of the Act itself, he should have filed a pretrial motion to suppress the evidence.  "Motions to suppress are described as 'objections to evidence on the ground that it was illegally obtained', including 'evidence obtained as a result of an illegal search' and 'other forms of illegality such as the use of unconstitutional means to obtain a confession.'" State v. Cook, 9 S.W.3d 98, 101 (Tenn. 1999).  Rule 12(b)(2)(C), Tennessee Rules of Criminal Procedure, requires that a motion to suppress evidence be filed and determined before trial.  "The rule is applicable when a claim of a constitutional right is involved whose violation would lead to suppression of evidence." State v. Goss, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998).  Therefore, the appellant was required to raise this issue pretrial.  However, because the State failed to argue at the motion for new trial hearing that the appellant waived the issue, we will address his argument.

Tennessee Code Annotated section 39-13-601(a)(1) provides, in pertinent part, as follows:

(a)(1) Except as otherwise specifically provided in §§ 39-13-601 - 39-13-603 and title 40, chapter 6, part 3, a person commits an offense who:

(A) Intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication;

(B) Intentionally uses, endeavors to use, or procures any other person to use or endeavor to use any electronic, mechanical, or other device to intercept any oral communication when:

(i) The device is affixed to, or otherwise transmits a signal through, a wire, cable, or other like connection used in wire communication; or

(ii) The device transmits communications by radio, or interferes with the transmission of the communication;

(C) Intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection (a); or

(D) Intentionally uses, or endeavors to use, the contents of any wire, oral or electronic communication, knowing or having reason to know, that the information was obtained through the interception of a wire, oral or electronic communication in violation of this subsection (a).

The Act provides for certain exceptions such as the following:

It is lawful under §§ 39-13-601 -- 39-13-603 and title 40, chapter 6, part 3 for a person acting under the color of law to intercept a wire, oral or electronic communication, where the person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

Tenn. Code. Ann. § 39-13-601(b)(2).

The Tennessee Act closely follows 18 United States Code Service section 2510 et seq. "The courts interpreting the Tennessee statute and/or its federal counterpart are in agreement that there is no violation of either state or federal law if one party to a conversation consents to the recording." Harold Dean McDaniel v. Kimberly Ruth McDaniel, No. E2009-00447-COA-R3-CV, 2010 Tenn. App. LEXIS 362, at *12 (Knoxville, May 27, 2010), perm. to appeal denied, (Tenn. 2010). As the McDaniel court noted, that conclusion is further supported by Tennessee Code Annotated section 40-6-302(b), which provides, in relevant part, that "[t]he interception of wire, oral or electronic communications, . . . when no party to the communications has consented to the interception, should be allowed only under compelling circumstances when authorized and supervised by a court of competent jurisdiction and upon a finding of probable cause." (Emphasis added.) Prior to each of the appellant's telephone calls, a prerecorded message informed both parties to the conversation that the call may be recorded at any time. In our view, the appellant implicitly consented to the interceptions by continuing with the call after the recorded warning. Therefore, the telephone calls were lawfully intercepted.

The appellant argues that if this court concludes he consented to the interceptions, then the plain language of the Act prevents the use of those interceptions in court. Once again, we disagree.

In support of his argument, the appellant cites Tennessee Code Annotated section 40-6-307, which provides as follows:

Whenever a wire, oral or electronic communication has been intercepted, no part of the contents of the communication and no evidence derived therefrom may be received in evidence in a trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the state of Tennessee, or a political subdivision of the state if the disclosure of that information would be in violation of this part or §§ 39-13-601 -- 39-13-603.

(Emphasis added.)  However, federal courts have interpreted 18 United States Code Service section 2515, which is almost identical to Tennessee Code Annotated section 40-6-307, to mean that the federal provision excludes evidence derived from illegal, not legal, wiretapping interceptions.  See United States v. Horton, 601 F.2d 309, 324 (7th Cir. 1979) (providing that because taped conversations were intercepted lawfully under the federal wiretapping law, their admission into evidence was proper); Fleming v. United States, 547 F.2d 872, 874 (5th Cir. 1977) (stating that 18 United States Code Service section 2515's "primary purpose is apparently to exclude evidence derived from illegal, rather than legal, wiretaps"); In re Proceedings to Enforce Grand Jury Subpoenas, 430 F. Supp. 1071, 1072-73 (E.D. Pa. 1977) (providing that "the purpose of the section 2515 exclusionary rule . . . is to deter privacy-invading misconduct by denying officials the fruits of their misconduct").

Moreover, we note that the purpose of the Tennessee Act is to

> prohibit the unauthorized interception of wire, oral and electronic communications and to prohibit the use of illegally obtained wire, oral and electronic communications as evidence in courts and administrative proceedings.  The interception of wire, oral or electronic communications, therefore, when no party to the communications has consented to the interception, should be allowed only under compelling circumstances when authorized and supervised by a court of competent jurisdiction and upon a finding of probable cause.

Tenn. Code Ann. § 40-6-302 (emphasis added).  Therefore, we conclude that Tennessee Code Annotated section 40-6-307, like the federal statute, does not exclude evidence obtained from legal interceptions.  Given that the appellant consented to the interceptions in this case, the interceptions were obtained lawfully, and the Act does not prohibit their use in court.

## D.  Transcripts

The appellant contends that the trial court committed plain error by admitting into evidence transcripts of the jailhouse telephone calls, allowing the transcripts to be sent back with the jurors during their deliberations, and failing to instruct the jury that the transcripts were not to be considered evidence in the case.  The State contends that the trial court did not err by allowing the jury to view the transcripts during deliberations and that, in any event, plain error relief is not warranted because any influence the transcripts had on the jury was minimal.  We agree that the appellant is not entitled to plain error relief.

During a pretrial hearing on the admissibility of the intercepted telephone calls, the State agreed to "burn" a CD containing the ten calls at issue for the trial court. At a subsequent pretrial hearing, the trial court requested that the State also provide the court with transcripts of the calls and underline or highlight what portions of the calls the State intended to play for the jury. In a later pretrial hearing, the parties and the trial court went through each transcript, and the trial court determined which portions of the calls the State could play for the jury.

At trial, Buddy Burkhart testified about the Knox County Sheriff's Office's procedure for enabling an inmate to make telephone calls from the detention facility. According to Burkhart, an inmate made telephone calls using his or her unique PIN; the inmate could only make calls to telephone numbers on the inmate's call list; and the date, time, and conversations were recorded and maintained on the facility's two computer servers. Pursuant to a request from the State, Burkhart provided the State with a telephone log of all calls made using the appellant's PIN. The State then played portions of ten calls for the jury.

At the conclusion of Burkhart's cross-examination testimony, a juror requested for the jury to receive transcripts of the calls. The State agreed to prepare the transcripts in time for court the next morning, and defense counsel stated, "That's fine with me." When court resumed the next day, the trial court stated that the transcripts "will just be an exhibit that will be submitted" and told the State to make a copy for each juror. The State did not introduce the CD containing the calls into evidence, and the CD is not in the record before us. However, the transcripts are in the record and labeled as exhibit number seventy-seven.

Tennessee Rule of Evidence 1002, also known as the best evidence rule, generally provides that in order to prove "the content of a writing, recording, or photograph, the original writing, recording or photograph is required." The rule's purpose is so "only the best or most accurate proof of written or similar evidence should be admitted, to the exclusion of inferior sources of the same proof, absent some extraordinary justification for the introduction of secondary evidence." Neil P. Cohen et al., Tennessee Law of Evidence § 10.01[2][a] (5th ed. 2005). As our supreme court has explained,

> Tape recordings and compared transcripts are admissible and may be presented in evidence by any witness who was present during their recording or who monitored the conversation and was in a position to identify the declarant with certainty, and provided the testimony of the witness in whole or in part, comports with the other rules of evidence.

-22-

State v. Walker, 910 S.W.2d 381, 394-95 (Tenn. 1995). Moreover, "a transcript of a tape may be given to a jury where the jury is instructed that the tape, and not the transcript is the actual evidence." State v. Barnard, 899 S.W.2d 617, 623-24 (Tenn. Crim. App. 1994).

It is not clear from the record why the State did not introduce the CD containing the recorded telephone calls into evidence. Pursuant to the best evidence rule, the CD, not the transcripts, was the best evidence. Furthermore, no testimony was presented from any witness who personally compared the audio recordings to the transcripts to verify their accuracy. Finally, the trial court should have instructed the jury that the audio recordings were the evidence to be considered, not the transcripts. However, the appellant never raised any objection to the transcripts' accuracy or their admissibility.

The appellant claims, without explanation, that these errors rise to the level of plain error. We may only consider an issue as plain error when all five of the following factors are met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

State v. Adkisson, 899 S.W.2d at 641-42 (Tenn. Crim. App. 1994) (footnotes omitted); see also State v. Smith, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the Adkisson test for determining plain error). Furthermore, the "'"plain error" must be of such a great magnitude that it probably changed the outcome of the trial.'" Adkisson, 899 S.W.2d at 642 (quoting United States v. Kerley, 838 F.2d 932, 937 (7th Cir. 1988)).

Upon review of the record, we do not believe the errors are of such magnitude that they changed the outcome of the trial. The appellant testified on direct that he believed the victim was dangerous and that he retrieved a gun from his duplex before going to the motel to confront the victim. Jill Falls and Robert Thomas gave surprisingly similar testimony regarding the events leading up to the kidnapping and the appellant's taking the lead role in beating and kidnapping the victim. The appellant, not Robert Thomas, had a motive to kill the victim, and ammunition similar to that used to shoot the victim was found in the appellant's bedroom. After the appellant's arrest, a microphone in Officer Faulkner's patrol car captured the appellant stating that Thomas "had nothing to do with it." The evidence against the appellant was strong, and he is not entitled to plain error relief.

E.  Potential Juror Hardin and Juror Mink

Next, the appellant contends that the trial court erred by dismissing potential juror Hardin for cause and failing to dismiss juror Mink for cause.  The State contends that the appellant has waived these issues because he failed to object to Hardin's dismissal and did not request for Mink to be excused for cause.  The State also argues that, regardless of the waiver, the trial court properly exercised its discretion.  We agree with the State.

During jury selection, the prosecutor asked the potential jurors, "Anybody going to have any problems, personal problems or religious problems, passing judgment on Mr. Graves?"  She then directed the question to each potential juror individually.  When she asked the question to prospective juror Hardin, Hardin replied, "I might."  The prosecutor asked Hardin to explain, and Hardin stated as follows:

> Because like you just said like (indiscernable) background, and like it's not -- to me it's not up to me to judge and then also not knowing his motive or what all really happened.  I can't honestly put judgment 'cause even in the bible it says that even if a man arrives and another man arrives (indiscernible) and he passes judgment on that.  So I can't honestly sit and wholeheartedly -- you know what I'm saying?  Just it would be my opinion and my opinion (indiscernible).  You know what I'm saying?

The prosecutor asked Hardin, "[I]s there anything that the judge can say to you to get you to be able to sit in judgment of Mr. Graves?"  Hardin replied, "I don't know."  The trial court asked Hardin, "So it would make you uncomfortable having to sit on this panel?"  Hardin answered, "Yes, sir."  The trial court stated, "Well, . . . I don't think it's fair . . . to put you in that position if you have those . . . beliefs."  The court dismissed her from the panel.

Jury selection resumed, and the prosecutor asked the prospective jurors if any of them had ever been the victim of a home burglary.  Prospective Juror Mink stated that his home had been burglarized five or six times over a thirty-year time period and that the people responsible had never been caught.  The following exchange then occurred:

> [State]: What did [the police] say?
>
> PROSPECTIVE JUROR MINK: They said that it sounded like so and so, and I said, "Well, catch them.  Sink the

boat," you know. And they said, "No. They got rights." I said, "Well, where's my rights?" you know.

[State]: It gets frustrating.

PROSPECTIVE JUROR MINK: And my son was home one day. They stomped the front door, you know, three men did. That was basically the same time. And he was about 14 year old, and three grown men steadily come toward him till he cocked the hammer of a empty 12-gauge and run them off, you know.

[State]: You report that to the police that time?

PROSPECTIVE JUROR MINK: Yes.

[State]: Did they do anything that time?

PROSPECTIVE JUROR MINK: No. They ain't going to do nothing.

Later, the State asked Mink if he had any problem sitting in judgment for religious reasons, and Mink said, "Not really." The State asked him if he could sit in judgment, and Mink said, "Yes." Neither the State nor the defense challenged Mink for cause, and he became a member of the jury.

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. See U.S. Const. amend. VI; Tenn. Const. art. I, § 9. Parties in civil and criminal cases are granted "an absolute right to examine prospective jurors" in an effort to determine they are competent. See Tenn. Code Ann. § 22-3-101. "A court may discharge from service a grand or petit juror . . . for any other reasonable or proper cause, to be judged by the court. That a state of mind exists on the juror's part that will prevent the juror from acting impartially shall constitute such cause." Tenn. Code Ann. § 22-1-105 (1994). Therefore, trial courts have "wide discretion in ruling on the qualifications of a juror." State v. Howell, 868 S.W.2d 238, 248 (Tenn. 1993). Absent an abuse of discretion, this court will not overturn the trial court's ruling. Burns v. State, 591 S.W.2d 780, 782 (Tenn. Crim. App. 1979). Irrespective of whether the trial judge should have excluded a challenged juror for cause, any possible error is harmless unless the jury who actually heard the case was not fair and impartial. Howell, 868 S.W.2d at 248; State v. Thompson, 768 S.W.2d 239, 246 (Tenn. 1989). The failure to correctly excuse a juror for

cause is grounds for reversal only if the defendant exhausts all of his peremptory challenges and an incompetent juror is forced upon him. Ross v. Oklahoma, 487 U.S. 81, 89 (1988); State v. Jones, 789 S.W.2d 545, 549 (Tenn. 1990).

Initially, we note that the State is correct in that the appellant has waived these issues. In any event, we find no merit to either claim. Regarding potential juror Hardin, the appellant complains that the trial court should not have dismissed her from the panel because her statements do not demonstrate she would have been unable to apply the law. Hardin stated that she might have trouble sitting in judgment of the appellant, and it was within the trial court's discretion to disqualify her from the panel. Regarding juror Mink, the appellant contends that Mink was incompetent to serve because he was predisposed to find the appellant guilty. Specifically, the appellant contends that "[i]f the police would not arrest the burglars of Mr. Mink's house despite knowing who they were, Mr. Mink believed that if a person was actually arrested, the person was probably guilty." However, that is not what Mink said. Mink's answers during voir dire demonstrate that he was frustrated by the repeated burglaries of his home and that he did not believe the police were going to help him. He never said he believed people arrested for burglaries in general were probably guilty. Regardless, the appellant has not shown that the jury was not fair or impartial. He is not entitled to relief.

## F. Prior Bad Acts

Finally, the appellant contends that Jill Falls' testimony about his prior bad acts was irrelevant, unduly prejudicial, and should not have been permitted. The State argues that the appellant has waived this issue. We agree and conclude that he is not entitled to plain error relief.

Prior to trial, the appellant filed a motion requesting that the trial court prohibit any of the State's witnesses from testifying about the appellant's prior bad acts. During a pretrial hearing, the State asked that Falls be allowed to testify at trial about the appellant kidnapping her, beating her on the head with a gun, and taking her to an area in east Knox County. According to the State, the appellant's prior bad acts against Falls showed a common scheme or plan and absence of mistake. The trial court disagreed and ruled such testimony was inadmissible during Falls' direct or cross-examination testimony.

Initially, Falls testified that on December 27, 2005, she saw the appellant at the Inskip Market and went with him to his duplex. The appellant accused Falls of stealing from him. Falls denied taking anything, and she spent the night with him. The next day, they went to the bank and Hooters. Then they picked up Robert Thomas and drove to the motel on Clinton Highway. Falls knocked on the victim's motel room door, and the appellant forced

his way inside the room. After the appellant kidnapped the victim, he and Thomas dropped off Falls at Bam and Granny's apartment. Later, the appellant picked up Falls, and she spent the night with him at his duplex. Falls testified that the next day, the police burst into the duplex, and Falls spoke with a police officer about what had happened.

At the conclusion of the testimony, the State requested a bench conference, and asked that Falls be allowed to "explain[] why she did what she did." The following exchange then occurred:

> THE COURT: So you're withdrawing your objection to her asking her about why she stayed with him?
>
> . . . .
>
> [Defense counsel]: She said if he shot her and all that kind of stuff.
>
> [State]: Okay.
>
> THE COURT: Okay.
>
> [Defense counsel]: That's fine.

When Falls' testimony resumed, the State told her, "Ms. Falls, we can now talk about the rest of it. Okay?" Falls then testified about the appellant kidnapping her from the Inskip Market, beating her on the head with a gun, and holding her against her will until the police forced their way into the duplex.

Rule 404(b), Tennessee Rules of Evidence, prohibits the introduction of evidence of other crimes, wrongs, or acts, except when the evidence of other acts is relevant to an issue at trial, such as identity, intent, or absence of mistake or accident, and its probative value is not outweighed by the danger of unfair prejudice. In this case, the trial court ruled that Falls' prior bad act testimony was inadmissible. During Falls' testimony, the State again requested that it be allowed to ask Falls about the appellant's prior bad acts, and the defense said, "That's fine." Therefore, the appellant has waived the issue.

Furthermore, we discern no plain error. On cross-examination, defense counsel questioned Falls extensively about inconsistencies in her prior bad act testimony and her statement to police. For example, on cross-examination, Falls testified that the appellant forced her to have sex with him and had a gun pointed at her back when they went to

Hooters. But the jury also heard that Falls told the police she had consensual sex with the appellant and that she never mentioned him pointing a gun at her at the restaurant. The defense also used Falls' bad act testimony to point out weaknesses on her story. For example, although Falls had testified that the appellant beat her severely on the head and that she bled onto the front seat, Thomas testified that no blood was on the seat and Officer Delgado testified that she did not take her to a hospital. The appellant has failed to show that defense counsel did not waive this issue for tactical reasons. See Adkisson, 899 S.W.2d at 641-42. Therefore, he is not entitled to relief.

## III. Conclusion

Based upon the record and the parties' briefs, we affirm the appellant's convictions.


_____
NORMA McGEE OGLE, JUDGE