IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs November 8, 2016

**STATE OF TENNESSEE v. ERIC DWAYNE WILSON**

**Appeal from the Circuit Court for Warren County**
**No. 15-CR-581     Larry B. Stanley, Jr., Judge**
_____

**No. M2016-00822-CCA-R3-CD – Filed May 25, 2017**
_____

Defendant, Eric Dwayne Wilson, in a jury trial, was convicted of third offense driving under the influence of an intoxicant (DUI), and of violating the implied consent law following a bench trial. Defendant pleaded nolo contendere to failure to stop at a stop sign and failure to have each required lamp and stoplight in operating condition. Defendant received a sentence of eleven months, twenty-nine days, with three hundred days of confinement in the county jail and the remainder of the sentence on supervised probation. He was also ordered to pay a $5,000 fine, and his license was revoked for six years.  Concerning the implied consent violation, the judgment form indicates that Defendant's driver's license was revoked for one year "consecutive to any revocation or suspension currently in effect."  Defendant was also sentenced to thirty days each for failure to stop at a stop sign and failure to have each required lamp and stoplight in operating condition to be served concurrently with the DUI charge. On appeal, Defendant contends that the evidence was insufficient to support his conviction for DUI and that there was no proof relating to the implied consent form and the search warrant.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

THOMAS T. WOODALL, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Robert S. Peters, Winchester, Tennessee, for the appellant, Eric Dwayne Wilson.

Herbert H. Slatery III, Attorney General and Reporter; Benjamin A. Ball, Senior Counsel, Assistant Attorney General; Lisa Zavogiannis, District Attorney General; and Darrell Julian, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

*Background*

## State's Proof

At approximately 9:00 p.m. on April 5, 2014, Deputy Eddie Colwell of the Warren County Sheriff's Department was parked on "the little private drive on Crisp Springs Road" next to a market, watching traffic at the intersection of Old Shelbyville Road and Crisp Springs Road. While sitting there, Deputy Colwell saw a Honda car run past the stop sign at the intersection without stopping. The car was traveling on Crisp Springs Road and made a left turn onto Old Shelbyville Road and was headed toward McMinnville. Deputy Colwell also noticed that the driver's side rear brake light of the car was broken. Deputy Colwell activated his blue lights and pulled the vehicle over. He walked up to the car and attempted to tell the driver, whom he said was Defendant, who he was and why he had pulled Defendant over. Deputy Colwell testified that Defendant began "yelling vulgar words as in, f[- -]k you, Jason Walker and saying that [Deputy Colwell] was Jason Walker . . ." Deputy Colwell attempted to calm Defendant, and he told Defendant multiple times that he was not Jason Walker. Jason Walker was a Sergeant with the Warren County Sheriff's Department and was Deputy Colwell's supervisor at the time. Defendant again said, "f[- -]k you, you're profiling me[.]" He also told Deputy Colwell that if the deputy did not have a gun, Defendant would "kick [his] f [- -]king ass." Deputy Colwell testified that Defendant's speech was slurred, and "his eyes appeared to be constricted and bloodshot."

Other officers arrived on the scene, and Deputy Colwell asked Defendant to exit his vehicle and perform some field sobriety tests. Deputy Colwell testified that Defendant at that point thought everything "was a big joke," and he was laughing. Deputy Colwell testified that the first test given was the horizontal gaze nystagmus (HGN), the second test was the walk-and-turn test, and the third test was the one-leg-stand. Deputy Colwell explained the tests to Defendant, and Defendant indicated that he understood them. Since the HGN is a scientific test, Deputy Colwell did not testify concerning the results of that test. He said that on the walk-and-turn test, Defendant could not keep his balance during the instructional stage. Deputy Colwell further testified: "[A]lso on the walking down and turn around and coming back he st[e]pped off the line and raised his arms for balance going down and coming back." Deputy Colwell determined that Defendant showed "clues of impairment" on the test.

Deputy Colwell then administered the one-leg-stand test to Defendant. As Deputy Colwell demonstrated the test to Defendant, Defendant "was making smart alec remarks, acting like everything was a joke and it was funny to him." When Defendant attempted to perform the test, "[h]e showed clues by putting his foot down three times and he also

raised his arms for balance." Deputy Colwell testified that he asked Defendant about medications or alcohol, and Defendant indicated that he had not consumed anything. Defendant did not mention any physical infirmities or injuries from fighting. Deputy Colwell also noted that Sergeant Jason Walker later arrived at the scene, and Defendant finally realized that Deputy Colwell was not Sergeant Walker.

Deputy Colwell testified that he asked Defendant to perform some additional "tasks." On the "[f]inger dexterity," Defendant "miscounted several times by jumping around on numbers from say 4 to 1 or 2 to 4. [Defendant] couldn't do his numbers correctly." Deputy Colwell next asked Defendant to start with the letter E of the alphabet and stop at the letter S. Defendant could not complete the task because he skipped letters. At that point Deputy Colwell felt that Defendant could not safely operate a vehicle, and he placed Defendant under arrest. Defendant "started cussing and yelling saying this was f[- - ]kin' bullshit," and he was "argumentative about the arrest." Deputy Colwell asked for a blood sample, and Defendant refused. He then read Defendant the "Tennessee Implied Consent Form." Defendant still refused to give a blood sample. Deputy Colwell advised Defendant of his *Miranda* rights and transported him to the Warren County Sheriff's Office. As they drove past the National Guard Armory, Defendant said that there were people outside the armory who were cheering for him because he was a mixed-martial-arts (MMA) fighter, and he had gotten arrested. However, no one was actually outside of the armory at the time.

Deputy Colwell obtained a search warrant for a sample of Defendant's blood after they arrived at the sheriff's office. Thereafter, Defendant was transported to the River Park Hospital to have his blood drawn. Deputy Colwell testified that Defendant was "very friendly" and kind to the nurses "because he was talking about how pretty and stuff they were, the things that he would like to do." Deputy Colwell testified that he was present when Defendant's blood was drawn and that it was placed into vials, labeled, sealed, "and placed into evidence at the sheriff's department" until it was sent to the Tennessee Bureau of Investigation (TBI) Crime Lab to be tested for drugs or alcohol.

Special Agent Holly Carrell is a Forensic Scientist in the toxicology section of the TBI Crime Lab and an expert in the field of forensic toxicology. She analyzed the blood samples in the present case and found that the sample contained methamphetamine at ".16 micrograms per milliliter and amphetamine was found at less than .05 micrograms per milliliter." Special Agent Carrell testified that .16 micrograms per milliliter of methamphetamine is above the *therapeutic* level. She further explained:

> Therapeutic level is what if you were to be prescribed the drug it's the range in which a doctor would want you to be so that you were receiving the desired effects of the drug. In this case methamphetamine had a therapeutic level range of .01 to .05 micrograms per milliliter.

- 3 -

Special Agent Carrell considered the amount of methamphetamine in the sample to be a "significant amount." Concerning the effects of that amount of methamphetamine on an individual, she testified:

> So methamphetamine is a central nervous system stimulant which means that it travels to your central nervous system and has a stimulating effect on the brain. So that can include effects such as euphoria, you know, feeling really, really good and excited about everything. It can make you also aggressive. It can also cause hallucinations or delusions, psychosis, hyperactivity or being fidgety and nervous, agitation, increased risk taking and yes, so things like those type of effects are typical with methamphetamine.

Special Agent Carrell testified that the level of methamphetamine in the sample could also adversely impact the ability to safely operate a motor vehicle.

Special Agent Carrell testified that Defendant's blood also contained amphetamine which is a metabolite of methamphetamine. She said, "Amphetamine does have its own effects and also amphetamine can be prescribed on its own." Special Agent Carrell explained:

> Amphetamine is also a central nervous system stimulant and it has similar effect to methamphetamine. So aggressive behaviors, restlessness. You can experience hallucinations or delusions, nervousness, things like that.

She testified that methamphetamine and amphetamine taken together or separately have effects on "divided attention tasks." They also impair judgment, visual perception, and reaction times. The parties stipulated at trial that the blood sample did not contain ethyl alcohol.

On cross-examination, Special Agent Carrell agreed that the National Highway Traffic Safety Administration level of methamphetamine for normal *recreational* usage is from .01 to .25 milligrams per liter with a median of .6.

**Defendant's Proof**

Faye Wilson, Defendant's mother, testified that Defendant worked on the family farm from approximately 6:30 a.m. until 8:00 p.m. on April 5, 2014, riding a tractor and disking fields. She saw Defendant when he came in to eat lunch and when he stopped by her house at 8:00 p.m. Mrs. Wilson testified Defendant was covered in dust when he

stopped by, and his eyes were red. She said that Defendant told her that he was going home to "clean up" and then going to Taco Bell to get something to eat. He also mentioned that it was his birthday. Ms. Wilson testified that Defendant seemed fine at the time.

Ms. Wilson testified that Defendant called her between 8:30 and 9:00 p.m. from his cell phone to tell her that he had been pulled over on Crisp Springs Road and that he was being charged with DUI. He told her that Sergeant Jason Walker and someone named "Griffith" were on the scene. Mrs. Wilson noted that Defendant and Sergeant Walker had attended school together beginning in the third grade, and the two always had problems with one another. She described them as "oil and vinegar." Mrs. Wilson testified that Defendant told her, "I'm going up there and I'm going to take that test and he said, I'm going to show them assholes that I am sober." Mrs. Wilson noted that Defendant cursed when he was anxious or upset, and he slurred his words.

Mrs. Wilson testified that Defendant called her a second time from the Warren County Jail and said that the prosecutor had walked in and served him with a warrant for a blood test. Mrs. Wilson testified that she could hear the prosecutor tell Defendant to cooperate. She said that Defendant told her that he did not take the test earlier because he was taken to jail rather than the hospital.

Mrs. Wilson testified that Defendant was a boxer for ten years and that he was very clumsy. She also noted that he had seizures when he was "about nine or ten." Mrs. Wilson testified that Defendant had been punched in the head during his boxing career, and he had been knocked out one time. She thought that the boxing affected Defendant's speech and balance. Mrs. Wilson testified that Defendant's "concentration level" was bad, and he did not follow tasks very well. She noted that he could sometimes be embarrassing because of his behavior. Mrs. Wilson testified that Defendant had an older brother who had been a passenger in the backseat of a car driven by an impaired driver in 1998. She said that Defendant's brother has numerous difficulties due to the accident and that "[b]asically he exists." Therefore, she would not allow Defendant to drive a vehicle if she thought that he was impaired, and he would never have left her house if she thought that he was impaired.

On cross examination, Mrs. Wilson testified that she had lunch with Defendant on April 5, 2014, and her husband took fuel to him one time while he was disking that day. When asked if Defendant was "constantly in her surveillance that entire time," Mrs. Wilson replied: "Pretty much so because I was outside in my garden most of the time." She said that she could see anything he was doing, and no one else "stepped foot on the property that day."

Mrs. Wilson agreed that Defendant was familiar with the intersection of Crisp Springs Road and Old Shelbyville Road and that he would know that there was a stop sign at the intersection. Mrs. Wilson testified that "most people don't stop, they just come on out." However, she also testified that she had not been through the intersection since moving from Jacksboro. Mrs. Wilson agreed that it was a "dangerous road" and that running a stop sign is also dangerous.

Mrs. Wilson testified that when Defendant called her from his cell phone, he told her that Deputy Colwell was arresting him and that Sergeant Walker, "a Griffith," and other officers were there. Mrs. Wilson did not know what Defendant did from the time that he left her house until he was pulled over. Mrs. Wilson testified that Defendant did not take any medication for his boxing injuries, and he had no medical records concerning any alleged injuries. Mrs. Wilson testified that Defendant would have no problem recognizing Sergeant Walker, and she agreed that Deputy Colwell in no way resembled Sergeant Walker. Mrs. Wilson testified that she could "guarantee" that Defendant could distinguish the two officers. She thought that the level of methamphetamine in Defendant's blood sample was "no more than what you would have in your system if you took a cold tablet." Mrs. Wilson did not believe that Defendant used methamphetamine because of his appearance compared to the appearance of her nieces who were addicted to methamphetamine.

Morris Wilson, Defendant's father, testified that he took fuel to Defendant on April 5, 2014, in the field where Defendant was working. He talked to Defendant as he filled the tractor with diesel, and Defendant seemed fine. Mr. Wilson also testified that Defendant was a boxer and that he had taken a lot of "head licks." He thought that Defendant was slower and off balance from boxing. Mr. Wilson testified that Defendant was difficult to understand when he got excited. He agreed that Defendant could be a jerk and "just a little bit aggravating." Mr. Wilson did not believe that Defendant was capable of taking ten steps walking "toe-to-toe." On cross-examination, Mr. Wilson admitted that Defendant was capable of operating "extensive" machinery and disking a field despite any boxing injuries.

*Analysis*

## I.    Sufficiency of the Evidence

Defendant contends that the evidence was insufficient to support his conviction for driving under the influence of an intoxicant (DUI). More specifically, he argues that the proof failed to establish his identity as the driver of the vehicle and that there was insufficient evidence of his intoxication. Defendant also challenges the credibility of Deputy Colwell. We disagree and conclude that the evidence is sufficient beyond a reasonable doubt to support the conviction.

When an accused challenges the sufficiency of the convicting evidence, our standard of review is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact, not this Court, resolves questions concerning the credibility of the witnesses, and the weight and value to be given the evidence as well as all factual issues raised by the evidence. *State v. Tuttle* 914 S.W.2d 926, 932 (Tenn. Crim. App. 1995). Nor may this Court reweigh or re-evaluate the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn.1978). On appeal, the State is entitled to the strongest legitimate view of the evidence and all inferences therefrom. *Id.* Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this Court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). "[D]irect and circumstantial evidence should be treated the same when weighing the sufficiency of [the] evidence." *State v. Dorantes*, 331 S.W.3d 370, 381 (Tenn. 2011).

Pursuant to the DUI statute,

> It is unlawful for any person to drive or to be in physical control of any automobile or other motor driven vehicle on any of the public roads and highways of the state, or on any streets or alleys, or while on the premises of any shopping center, trailer park or apartment house complex, or any other premises that is generally frequented by the public at large, while . . . [u]nder the influence of any intoxicant, marijuana, controlled substance, controlled substance analogue, drug, substance affecting the central nervous system, or combination thereof that impairs the driver's ability to safely operate a motor vehicle by depriving the driver of the clearness of mind and control of oneself that the driver would otherwise possess[.]

Tenn. Code Ann. § 55-10-401(a)(1)(2012).

Viewed in the light most favorable to the State, the proof in this case is sufficient to show Defendant's identity as the driver of the vehicle. Identity is an essential element of any crime. *See generally White v. State*, 533 S.W.2d 735, 744 (Tenn. Crim. App. 1975). Our law provides that identification of the perpetrator of a crime may be accomplished by either direct or circumstantial evidence, or both. *State v. Thompson*, 519 S.W.2d 789, 793 (Tenn. 1975). The determination of identity is a question of fact for the jury after consideration of all competent evidence. *See Biggers v. State*, 219 Tenn. 553, 411 S.W.2d 696, 697 (1967); *Marable v. State*, 203 Tenn. 440, 313 S.W.2d 451

(1958); *State v. Crawford*, 635 S.W.2d 704 (Tenn. Crim. App. 1982). In this case, Defendant's identity was established by Deputy Colwell's testimony in which he repeatedly referred to the driver of the car as "Mr. Wilson," and when asked if "the same Mr. Wilson" was seated beside Defendant's trial counsel, Deputy Colwell replied, "Yes, sir." He also testified that no one else was in the vehicle with Defendant at the time of the stop. Mrs. Wilson also testified that Defendant called her between 8:30 and 9:00 p.m. on April 5, 2014, and told her that he had been pulled over on Crisp Springs Road and that he was being charged with DUI. She also said that he told her that Deputy Colwell was arresting him and that Sergeant Jason Walker was on the scene. Therefore, the proof establishes Defendant's identity as the perpetrator of the offense.

Likewise, the proof is sufficient to establish Defendant's intoxication at the time of the offense. Deputy Colwell testified that Defendant exhibited several "clues" of intoxication during the field sobriety tests. Defendant also slurred his speech, had red eyes, his pupils were constricted, and his behavior was belligerent and irrational. Special Agent Carrell testified that the level of methamphetamine in Defendant's blood sample was ".16 micrograms per milliliter and amphetamine was found at less than .05 micrograms per milliliter." Special Agent Carrell testified that .16 micrograms per milliliter of methamphetamine is three times in excess of therapeutic levels. Special Agent Carrell considered the amount of methamphetamine in the sample to be a "significant amount." Concerning the effects of that amount of methamphetamine on an individual, she testified:

> So methamphetamine is a central nervous system stimulant which means that it travels to your central nervous system and has a stimulating effect on the brain. So that can include effects such as euphoria, you know, feeling really, really good and excited about everything. It can make you also aggressive. It can also cause hallucinations or delusions, psychosis, hyperactivity or being fidgety and nervous, agitation, increased risk taking and yes, so things like those type of effects are typical with methamphetamine.

Special Agent Carrell testified that the level of methamphetamine in the sample could also adversely impact the ability to safely operate a motor vehicle.

Additionally, Special Agent Carrell testified:

> Amphetamine is a metabolite of methamphetamine, which means that if you have methamphetamine in your system, your body converts it to amphetamine as it prepares to excrete it from your body. Amphetamine does have its own effects and also amphetamine can be prescribed on its own.

Special Agent Carrell also explained:

> Amphetamine is also a central nervous system stimulant and it has similar effect to methamphetamine. So aggressive behaviors, restlessness. You can experience hallucinations or delusions, nervousness, things like that.

She testified that methamphetamine and amphetamine taken together or separately have effects on "divided attention tasks." They also impair judgment, visual perception, and reaction times. Special Agent Carrell noted that the two drugs acting together "could produce an increased effect."

Defendant's behavior in this case was similar to those effects described by Special Agent Carrell. Defendant showed signs of aggression, confusion, irrational behavior, paranoia, and delusions. Despite being corrected several times, Defendant continued to confuse Deputy Colwell with Sergeant Walker. He repeatedly cursed at the officers and laughed throughout the field sobriety tests. He also threatened to kick Deputy Colwell's "f[- - ]king ass." Defendant had hallucinations or delusions of people standing in front of the National Guard Armory cheering him when absolutely no one was there. The evidence was sufficient to establish Defendant's intoxication.

Defendant also challenges Deputy Colwell's credibility. Issues of credibility and identity are questions reserved for the jury. The jury had the opportunity to assess the credibility of the State's witnesses at trial. The jury, by its verdict, obviously accredited the testimony of the State's witness as was their prerogative. *See State v. Millsaps,* 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000) (stating that "the weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the trier[ ] of fact"). In our view, the evidence was sufficient for a rational trier of fact to have found beyond a reasonable doubt that Defendant was the driver of the car and that he committed the offense of DUI. Defendant is not entitled to relief on this issue.

### B.    Failure to Present Search Warrant

Defendant argues that "there was no presentation of the search warrant that was used to obtain the defendant's blood draw." Defendant further asserts that "[t]here is no evidence that this search warrant was presented to the defendant nor has it been made part of the record in this case." However, this issue is raised for the first time on appeal. Additionally as pointed out by the State, Defendant did not file a motion to suppress the blood draw nor did he challenge the admission of the blood test at trial.

Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an

error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." The failure to make a contemporaneous objection constitutes waiver of an issue on appeal. *State v. Gilley*, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). A motion to suppress evidence must be raised prior to trial. Tenn. R. Crim. P. 12(b)(2)(C); *See also State v. Goss*, 995 S.W.2d 617, 628 (Tenn. Crim. App. 1998). Failure to raise the suppression issue before trial results in a waiver of such issue. Tenn. R. Crim. P. 12(f)(1). Furthermore, "[I]n all cases tried by a jury, no issue presented for review shall be predicated upon . . . misconduct of . . . counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for new trial; otherwise such issues will be treated as waived. Tenn. R. App. P. 3(e). Since Defendant raised the issue of the search warrant for the first time on appeal, it is waived. *See State v. Keel*, 882 S.W.2d 410, 416 (Tenn. Crim. App. 1994)("[T]he failure to include an issue in a motion for new trial results in waiver of all issues which, if found to be meritorious, would result in the granting of a new trial."). Defendant is not entitled to relief on this issue.

_____
THOMAS T. WOODALL, PRESIDING JUDGE